GARY A. PRAGLIN (SBN 101256)
gpraglin@cpmlegal.com
KELLY W. WEIL (SBN 291398)
kweil@cpmlegal.com
HANNAH K. BROWN (SBN 337592)
hbrown@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd., Suite 3088
Santa Monica, CA 90405
Tel.: (310) 392-2008
Fax: (310) 392-0111

ALEXANDER M. SCHACK (SBN 99126)
alexschack@schacklawgroup.com
NATASHA N. SERINO (SBN 284711)
natashaserino@schacklawgroup.com
SHANNON F. NOCON (SBN 316523)
shannonnocon@schacklawgroup.com
**SCHACK LAW GROUP**
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Tel.: (858) 485-6535
Fax: (858) 485-0608

GREGORY J. HOUT (SBN 135746)
ghout@houtlaw.com
**LAW OFFICES OF GREGORY J. HOUT**
12396 World Trade Drive Suite 206
San Diego, CA 92128
Tel.: (858) 946-6658
Fax: (858) 946-6659

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NURSERY PRODUCTS LITIGATION<br><br>This Document Relates To: All Actions | Lead Case No. 5:22-cv-01866-FLA-KKx<br><br>**FIRST AMENDED COMPLAINT** |

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

# **TABLE OF CONTENTS**

**PAGE NO.:**

I.   NATURE OF THE CASE ...................................................................... 1

II.  JURISDICTION AND VENUE .............................................................. 2

III. THE PARTIES ...................................................................................... 2

   A.   Plaintiffs................................................................................................ 2

   B.   Defendants ............................................................................................ 3

IV. JOINT VENTURE AND ALTER EGO LIABILITY .......................... 4

V.  FACTUAL BASIS FOR THE CLAIMS ASSERTED ......................... 8

   A.   Background ............................................................................................ 8

   B.   The Nursery Products Hawes Composting Facility ............................. 9

   C.   Spontaneous Combustion in Large-Scale Composting ...................... 12

   D.   The Facility's History of Safety and Regulatory Violations .............. 12

   E.   Conditions Leading to the Fire ........................................................... 17

   F.   The Fertilizer Fire, Subsequent Smoldering, and Defendants' Botched Response 19

   G.   Effects of the Fire ............................................................................... 23

VI. BASIS FOR MEDICAL MONITORING DAMAGES ...................... 26

VII. CAUSES OF ACTION ........................................................................ 27

   FIRST CAUSE OF ACTION ................................................................... 27

   SECOND CAUSE OF ACTION .............................................................. 34

   THIRD CAUSE OF ACTION .................................................................. 37

   FOURTH CAUSE OF ACTION .............................................................. 39

   FIFTH CAUSE OF ACTION ................................................................... 42

   SIXTH CAUSE OF ACTION .................................................................. 44

   SEVENTH CAUSE OF ACTION ............................................................ 46

   EIGHTH CAUSE OF ACTION ............................................................... 48

VIII.  PRAYER FOR RELIEF .................................................................... 55

1  |  IX.    JURY TRIAL DEMAND......................................................................................57

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Plaintiffs bring this action against Defendants Nursery Products, LLP, a California corporation; Synagro Technologies, Inc., a Delaware corporation; Synagro-WWT, Inc., a Maryland corporation; The Goldman Sachs Group, Inc., a Delaware corporation; and ten fictitiously named Defendants (collectively, "Defendants"). Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs' own experiences and on information and belief as to all other matters based on an investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery.

## I.   NATURE OF THE CASE

1.     This case arises from the sickening of thousands of residents throughout the unincorporated town of Hinkley, California, the City of Barstow, California and in neighboring communities and cities beginning on May 28, 2022, due to Defendants' negligent disregard for safety.

2.     Beginning on May 28, 2022, and ongoing for months, thousands of individuals – including Plaintiffs herein – were exposed to elevated levels of burnt biosolids and other contaminants emitted from the Nursery Products Hawes Composting Facility (the "Facility") located in Helendale, California, and other dump sites in the area, following a fire that burned for days and continued to smolder for weeks on end (the "Fire").[1]

3.     The Facility consists in part of an open-air pit to compost two forms of waste from across Southern California: biosolids and green materials.  Defendants have also engaged in off-site dumping of waste and/or material from their operation, resulting in Dump Sites in and around the Facility.  Dump Sites include but are not limited to the Facility and other locations in the area used by Defendants as part of its operations.

4.     Biosolids, also known as sewage sludge, are a mix of organic solids comprised largely of human feces and are commonly associated with the process of

[1] The term "Facility" shall include any off-site dump sites in the surrounding area (hereinafter "Dump Sites") used by Defendants to dump waste and/or materials in connection with their operation of the Nursery Products Hawes Composing Facility.

**FIRST AMENDED COMPLAINT; LEAD CASE NO. 5:22-cv-01866-FLA-KKx**                1

1   recycling human waste into fertilizer and compost.[2]

2       5.   Inhalation of and contact with burning human waste carries significant

3   short-term health effects, such as nausea, headaches, and respiratory irritation; long-term

4   effects include damage to the central nervous system, cardiovascular system,

5   reproductive system, peripheral nervous system, and gastrointestinal tract.[3]

6       6.   Plaintiffs bring this action to recover compensatory damages associated

7   with their exposure to odor and chemicals from the Fire (including but not limited to

8   damages for medical monitoring), for punitive damages, and for injunctive relief.

9   **II.   JURISDICTION AND VENUE**

10      7.   This Court has subject matter jurisdiction over this action because Plaintiffs

11  are citizens of California; Defendant Synagro Technologies, Inc. is a Delaware

12  corporation; Defendant Synagro-WWT, Inc. is a Maryland corporation; Defendant The

13  Goldman Sachs Group, Inc. is a Delaware corporation; and the amount in controversy

14  exceeds $75,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(a).

15      8.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a

16  substantial portion of the acts or omissions giving rise to the claims in this Complaint

17  occurred in this District, and because Defendants are subject to the Court's personal

18  jurisdiction with respect to this action.

19      9.   This case was removed by Defendants from the Superior Court of the State

20  of California, County of San Bernardino to this Court.  Plaintiffs have not contested

21  removal.

22  **III.   THE PARTIES**

23      **A.   Plaintiffs**

24      10.  Plaintiffs are individuals who, at all times relevant to this action, resided in

25  the areas impacted by the release of air contaminants from burning biosolids from the

---

[2] U.S. EPA, *Biosolids Technology Fact Sheet* (Sept. 2002),
https://www.epa.gov/sites/default/files/2018-11/documents/use-composing-biosolids-management.pdf.

[3] U.S. Department of Veterans Affairs, *Burn Pits (Trash and Human Waste Exposures)* (Nov. 2013), https://www.warrelatedillness.va.gov/education/factsheets/burn-pits.pdf.

Facility beginning on or around May 28, 2022 and/or came into contact with the materials from Defendants' Facility and/or Dump Sites resulting in physical injury. Plaintiffs have suffered damages, losses, and harm as a result of their exposure to the air contamination including, but not limited to, physical injury, fear of future physical injury, increased risk of future injury, emotional distress, harm to real and personal property, interference with the quiet use and enjoyment of their home, medical expenses, and economic damages.

11.     The exact names and capacities in which Plaintiffs are suing may be presently unknown and therefore Plaintiffs bring this action in their capacities as individuals, trustees, executors, officers, guardians ad litem, members, shareholders, heirs, survivors, and principals, as may be applicable.  A current list containing each Plaintiff's name is attached hereto as **Exhibit A**.

**B.     Defendants**

12.     Nursery Products, LLP ("Nursery Products") is a California corporation with its principal place of business in California.  Nursery Products owns and operates the Nursery Products Hawes Composting Facility located at 14479 Cougar Road, Helendale, California 92342 in San Bernardino County.  Nursery Products owns the land on which the Facility sits.

13.     Synagro-WWT, Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland.  Synagro-WWT, Inc. owns Nursery Products.

14.     Synagro Technologies, Inc. ("Synagro"), is a Delaware corporation with its principal place of business in Baltimore, Maryland.  Synagro Technologies, Inc. owns Synagro-WWT, Inc.  Synagro Technologies, Inc. is a large, privately-traded company which owns and invests in waste treatment and composting facilities.  Synagro owns, manages, and exercises control over the Facility.

15.     The Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation with its principal place of business in New York.  One of Goldman Sachs' infrastructure investment funds, West Street Infrastructure Partners III ("WSIP III"),

1  acquired Synagro Technologies, Inc. in December 2020.   WSIP III is managed by
2  Goldman Sachs Merchant Banking Division.

3      16.   There are several individuals and/or entities whose true names and
4  capacities are currently not known to Plaintiffs.  Evidence may come forth that others
5  are legally responsible and liable to Plaintiff to the extent of the liability of the named
6  Defendants.  Plaintiff will seek leave of the Court to amend this Complaint to reflect the
7  names and capacities of other potential Defendants when such identities and capacities
8  become known.  Plaintiff reserves the right to amend this claim pursuant to Fed. R. Civ.
9  P. 15(a) and Fed R. Civ. P. 21 with leave of the Court to add and amend potential
10 defendants.

11     17.   At all times herein mentioned, each of the Defendants was the agent,
12 servant, employee, and/or partner of each of the remaining Defendants named herein
13 and were at all times operating and acting within the purpose and scope of said agency,
14 service, employment, and/or partnership.  Each Defendant has rendered substantial
15 assistance and encouragement to the other Defendants, acting in concert, knowing that
16 its conduct was wrongful and/or unlawful, and each Defendant has ratified and approved
17 the acts of each of the remaining Defendants.

18 **IV.   <u>JOINT VENTURE AND ALTER EGO LIABILITY</u>**

19     18.   Each of the members of a joint venture, and the joint venture itself, are
20 responsible for the wrongful conduct of a member acting in furtherance of the venture.

21     19.   Plaintiffs are informed and believe, and thereon allege, that Defendants
22 Nursery Products, Synagro-WWT, Inc., and Synagro Technologies, Inc. (collectively,
23 "Facility Defendants") were operating a joint venture at all times relevant herein because
24 (a) all Facility Defendants share ownership interest in the composting business; (b) all
25 Facility Defendants have joint control over the business; (c) all Facility Defendants share
26 profits and losses of the business; and (d) an implied or express joint venture agreement
27 has been formed by Facility Defendants' conduct.
28 / / /

20.     Each of the members of a joint venture, and the joint venture itself, are responsible for the wrongful conduct of a member acting in furtherance of the venture.

21.     In 2016, Nursery Products was acquired by the self-proclaimed "largest recycler of organic by-products in North America," Synagro Technologies, Inc., under its subsidiary Synagro-WWT, Inc.

22.     As of the date of filing, Nursery Products was the owner of the Property located at 14479 Cougar Road, Helendale, California, according to the San Bernardino County Recorder's office.

23.     Plaintiffs are informed and believe, and thereon allege, that Facility Defendants are operating a single composting company as a Joint Venture and each of the members of the Joint Venture are responsible for the wrongful conduct and obligations of a member acting on behalf of the venture.

24.     Plaintiffs are further informed and believe, and thereon allege, that a unity and sameness exists between Facility Defendants such that each is the alter ego of the other.  There is a unity of interests between Synagro Technologies, Inc., Synagro-WWT, Inc., and Nursery Products because all Facility Defendants (a) failed to abide by corporate formalities by operating the composting company interchangeably; (b) commingled corporate funds and other assets; and (c) dominated the legal and administrative affairs of the composting company.

25.     At all relevant times, Facility Defendants were operating a single composting facility. The three entities and individual are alter egos of each other, for purposes of operation of the composting facility, such that the corporate form of Synagro Technologies, Inc., Synagro-WWT, Inc., and Nursery Products should be disregarded.

26.     An unjust result will follow if the Court chooses to observe and uphold the corporate fiction between Defendants Synagro Technologies, Inc., Synagro-WWT, Inc., and Nursery Products.

27.     Defendant Goldman Sachs is in joint venture with the Facility Defendants, as an owner of Facility Defendants.  Three members of the Board of Directors of

Synagro Technologies, Inc.—Cedric Lucas, Christopher Crampton, and Nick Semeniuk—are employees of Goldman Sachs.   According to Synagro's website, Synagro's Technologies' Vice President and Head of Corporate Development and Mergers and Acquisitions, Ben Gilreath, was a vice president at Goldman Sachs and advised on "the original acquisition of Synagro by Goldman Sachs."

28.   Cedric Lucas, Synagro Technologies, Inc. Board member, is a managing director in the Asset Management Division of Goldman Sachs, focused on private equity infrastructure investing in the Americas.  He has a history of finance as it relates to infrastructure and energy.  Mr. Lucas also serves as a member of Synagro Technologies, Inc.'s Growth, Compensation, Human Resources and Talent and Audit Committees.

29.   Chris Crampton, Synagro Technologies, Inc. Board member, leads Goldman Sachs' Asset Management Division private equity investing in the services sector.  He is a partner at Goldman Sachs.

30.   Nick Semeniuk, Synagro Technologies, Inc. Board member, is a vice president in Goldman Sachs' Asset Management Division.  In addition to his role as a director of Synagro Technologies, Inc., Mr. Semeniuk also serves as a member of Synagro Technologies, Inc.'s Growth and Compensation, Human Resources and Talent Committees.

31.   Goldman Sachs and its employees have direct control over Synagro Technologies, Inc.'s finding and hiring of employees, compensation of employees, and overall growth of the business.  No other members of the Synagro Technologies, Inc.'s Board of Directors are members of the Growth and Compensation, Human Resources and Talent Committees.

32.   There is also significant overlap between the Facility Defendants. Venny Vasquez, the Site Manager of the Nursery Products Hawes Composting Facility in Helendale, California is a Synagro employee.  According to documents obtained through public records requests, Venny Vasquez has a "Synagro" email address of vvasquez@synagro.com.  Mr. Vasquez's signature line in emails also includes a link to

the "synagro.com" website.  Other employees of Synagro, including but not limited to Craig Geyer, Jeffrey Faust, and Layne Baroldi were also included on emails with government officials regarding the Facility and its violations.

33.     Government records also show that Mr. Vasquez sent correspondence to the Lahontan Regional Water Quality Control Board regarding the Facility as Site Manager on "Synagro" letterhead.  This correspondence also included a Groundwater Monitoring Report prepared by Geosyntec Consultants that reads:

"Prepared for

Synagro Technologies

2653 Santiago Road

Taft, California 93268"

34.     The Groundwater Monitoring Report also included correspondence dated March 30, 2020 from Geosyntec Consultants to Craig Geyer, Area Plant Director, Synagro Technologies concerning "the Hawes Composting Facility located in Helendale, California."

35.     In addition, on August 2, 2022, the Lahontan Regional Water Quality Control Board sent a letter to Layne Baroldi at Synagro WWT, Inc. regarding the waste accepted at the Nursery Products Hawes Composing Facility.  The letter was addressed as follows:

Layne Baroldi

Synagro WWT, Inc.

135 Reposado Drive

La Habra Heights, CA 90631

lbaroldi@synagro.com

36.     A June 24, 2022 Application for Solid Waste Facility Permit and Waste Discharge Requirements filed with the State of California Department of Resources Recycling and Recovery, Regional Water Quality Control Board listed "Nursery Products, LLC" as the Facility Operator of the Nursery Products Hawes Composting

Facility and appear to be signed by Craig Geyer and Venny Vasquez.

37.     Plaintiffs therefore are informed and believe, and thereon allege, that a unity and sameness exists between Goldman Sachs and Facility Defendants such that each is the alter ego of the other.  An unjust result will follow if the Court chooses to observe and uphold the corporate fiction between Goldman Sachs and Facility Defendants.

## V.     FACTUAL BASIS FOR THE CLAIMS ASSERTED

### A.     Background

38.     At all relevant times herein, Plaintiffs resided in the unincorporated town of Hinkley, California and/or surrounding communities in the County of San Bernardino and/or were in the relevant area during the Fire and subsequent smoldering, and were sickened and injured, and suffered damage to their real and personal property, as a result of the exposure to the contaminated air and/or direct contact with material from Defendants' Facility.

39.     Plaintiff Brayan Luna fell into material at one of Defendants' Dump Sites and suffered severe physical injuries, including but not limited to burns that required hospitalization.

40.     Hinkley and Barstow are primarily residential communities located in the Mojave Desert in west San Bernardino County, California.

41.     Hinkley, Barstow, and the surrounding cities and communities are home to families, pets, ranches, and farms.

42.     The residential homes are typically widely spaced across the desert and are generally older structures that are not fitted with refrigerated or central air conditioning units.  The majority of residents rely on swamp coolers to cool their homes.  Swamp coolers recycle outdoor air in order to cool the air inside the home, introducing outdoor air contamination.  Swamp coolers do not filter the air that blows into the structure.

43.     Swamp coolers are typically run around the clock during hot weather in the high desert, which was the case at nearly all relevant times herein.  As a result, the odor

1   and chemicals in the outdoor air entered Plaintiffs' home at all relevant times herein in

2   addition to typical outdoor-indoor air circulation.

3   **B.     The Nursery Products Hawes Composting Facility**

4   44.     Facility Defendants own and operate the Facility, an open-air biosolids

5   composting facility located at 14479 Cougar Road, Helendale, California,

6   approximately fourteen miles west of Hinkley, twenty-five miles west of Barstow, and

7   110 miles east of Los Angeles.  The Facility spans eighty acres.  It is permitted to hold

8   up to one million cubic yards of waste at any one time.  This is equivalent to one and a

9   half million tons, on sixty football fields. The Facility is an open-air composting factory

10  that is supposed to take in biosolids and green waste to convert into compost and

11  fertilizer. In addition to the main Facility, there are locations in the surrounding area,

12  including but not limited to Hinkley, California, where Defendants dump material.



*Nursery Products Hawes Composting Facility*

24  45.     The Facility commenced operations in 2011 after protracted litigation over

25  its location in the community, potential environmental impact, and its lack of resources

26  to fight an inevitable compost fire.[4]

---

[4] *See Ctr. for Biological Diversity v. Cnty. of San Bernardino*, 185 Cal. App. 4th 866, 111 Cal. Rptr. 3d 374 (2010).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

46.     Facility Defendants collect biosolids, green waste, and other materials from around Southern California, and put the collected materials through a composting process, which involves letting the materials sit for a period of time, aeration, and contamination checks.  Once the composting process is complete, the finished product becomes Defendant Synagro's branded AllGro Fertilizer, which it sells for use on land in California and surrounding states.[5]

47.     The Facility is permitted to accept biosolids, derived from human waste, and green material, derived from plants, to use as their compost material.  The Facility also accepts and composts un-permitted "mixed material" (material that is neither biosolids nor green waste), which has led to at least **twenty** Notices of Violation issued by CalRecycle.  As of the date of filing, the violations related to accepting "mixed material" have not been resolved.

48.     Biosolids, also known as sewage sludge, are made up of the solids that filter out of wastewater through the wastewater treatment process.[6]  In other words, biosolids are largely human feces.  Biosolids, and the transportation, collection, storage, and treatment of biosolids, are highly regulated by the U.S. Environmental Protection Agency ("EPA"), by mandate of the Clean Water Act, 33 U.S.C. §§ 1151, *et seq.*

49.     The EPA has identified over 700 chemical and microbial pollutants in biosolids.  Among the chemical pollutants are pesticides, flame retardants, and perfluoroalkyl substances ("PFAS").  The microbial pollutants found in biosolids include *Escherichia coli* ("*E. coli*"), enterovirus, and fecal coliforms.[7]

50.     Due to the nature of the waste processed at the Facility and the contaminants involved, Defendants' operation of the waste Facility and Dump Sites is

---

[5] Synagro, *AllGro® Compost* (last visited Dec. 7, 2023), https://www.synagro.com/all-gro-compost-2/.

[6] U.S. EPA, *Basic Information about Biosolids* (Apr. 29, 2022), https://www.epa.gov/biosolids/basic-information-about-biosolids.

[7] U.S. EPA, *Biennial Review of 40 CFR Part 503 as Required under the Clean Water Act Section 405(d)(2)(C)* (Feb. 2021), https://www.epa.gov/sites/default/files/2021-02/documents/biennial-review8-report-2021.pdf.

an ultrahazardous activity that involves the handling, collection, storage, treatment, composting and containment of waste substances, human feces, solid waste, sewage, green waste, biosolids and/or other substances containing unsafe materials. If not operated in a reasonably safe manner, there is a foreseeable risk of harm to the surrounding public, including but not limited to through the release of smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals.

51.     In total, the Facility processes around 400,000 wet tons of material per year and is permitted to accept no more than 2,000 wet tons per day.

52.     Since at least May 2022, Defendants have been operating the Facility in an unreasonably dangerous manner.  This includes accepting excessive waste, failing to control fires at the Facility and/or Dump Sites, improperly dumping waste off-site in numerous locations, putting mixed waste and unpermitted waste into the composting pit, allowing waste and litter to gather at the Facility and/or Dump Sites, processing unacceptable forms of waste, and operating the Facility and/or Dump Sites in a manner that causes smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals to emanate into the surrounding area and enter the properties of Plaintiffs.

53.     In May 2022, the San Bernardino Department of Public Health cited Facility Defendants for accepting excessive wet waste (more than 2,000 wet tons per day) on twelve days leading up to the Fire: April 1, 2022 (2,165 tons); April 5, 2022 (2,527 tons); April 6, 2022 (2,049 tons); April 7, 2022 (2,251 tons); April 11, 2022 (2,056 tons); May 10, 2022 (2,137 tons); May 12, 2022 (2,079 tons); May 17, 2022 (2,055 tons); May 20, 2022 (2,011 tons); May 24, 2022 (2,018 tons); May 25, 2022 (2,306 tons); May 26, 2022 (2,037 tons).  Thus, in the months and days before the Fire broke out, the Facility was accepting and housing hundreds of wet tons more waste than is permitted.

/ / /

**C.**   **Spontaneous Combustion in Large-Scale Composting**

54.   "The nature of composting and organics recycling activities presents ample opportunities for a fire to develop."[8]  Compost fires can be started by lightning strikes, heat or sparks from on-site equipment, wildfires, and, most commonly, spontaneous combustion.[9]

55.   "In large piles of organic materials, with limited available oxygen, spontaneous combustion usually leads to a smoldering fire…if enough oxygen is suddenly supplied by the aeration system or by opening up the pile, temperatures will increase immediately and dramatically to create a flaming fire."[10]

56.   External conditions that can lead to spontaneous combustion include, but are not limited to, maintaining large, well-insulated piles of organic material, limiting airflow into the piles, letting the piles sit for long periods of time, and poor distribution or mix of materials within the piles.[11]

57.   Compost piles should be regularly turned and aerated so as to avoid increasing temperatures that can lead to spontaneous combustion.  "[T]he combination of low moisture, large piles (or containers), and little air exchange is a prescription for spontaneous combustion."[12]

**D.**   **The Facility's History of Safety and Regulatory Violations**

58.   The local regulatory bodies with jurisdiction over the Facility include CalRecycle, the Lahontan Regional Water Quality Control Board, the Mojave Desert Air Quality Management District ("AQMD"), and the San Bernardino County Department of Public Health – Environmental Health Services.

59.   In recent years, the Facility has been issued numerous Notices of Violation ("NOVs") by various regulatory agencies.  As further alleged herein, Defendants have

---

[8] Robert Rynk, *Fires at Composting Facilities: Causes and Conditions*, 41 BioCycle 54, 58 (2000).
[9] *Id*. at 55.
[10] *Id*. at 56.
[11] *Id*.
[12] *Id*. at 57.

repeatedly violated State laws and regulations and have been cited for violations multiple times by government agencies, including but not limited to the County of San Bernardino and the Mojave Desert Air Quality Management District.

60.     For example, Defendants' Facility has repeatedly accepted excessive loads of waste.  In violation of California Public Resources Code § 44002, the Facility received more than the maximum daily tonnage of 2,000 wet tons on multiple occasions between April 2022 and June 2022.  According to a San Bernardino County Environmental Health Services report (filed June 24), Defendants exceeded the intake limit on multiple occasions before the fire started, including multiple times the week of the fire.  Alleged intake violations occurred on April 1, 5, 6, 7, and 11, 2022 and on May 10, 12, 17, 20, 24, 25 and 26, 2022.

61.     In conjunction with acceptance of excessive waste, Defendants have also repeatedly allowed waste to accumulate on the property and various Dump Sites in violation of 14 Cal. Code. Regs. § 17867, subd. (a)(3).  In June 2022, waste was observed accumulating on the south side of the property and the northeast side of the property.  Defendants have also repeatedly allowed litter to gather, including but not limited to near the entrance of the Facility. Such conduct is a direct violation of California Code of Regulations, Title 14, section 17867, which provides that "[a]ll handling activities shall be conducted in a manner that minimizes vectors, litter, hazards, nuisances, and noise impacts; and minimizes human contact with, inhalation, ingestion, and transportation of dust, particulates, and pathogenic organisms."

62.     Defendants have also processed and continue to process unacceptable forms of waste.  The County of San Bernardino has repeatedly cited the Facility for health and safety code violations.  Among one of the repeated violations was Defendants' practice of contaminating its pit with unpermitted, unsafe, and/or improper forms of waste including mixed waste, raw sewage, industrial materials, mixed demolition and construction debris, plastics, food material and/or brewery waste.  The Facility, however, is only allowed to accept two forms of waste: biosolids and green

materials.   On information and belief, Defendants have also added fresh waste to processed compost that was about to be shipped out.

 

*Litter, including plastics, in and around the Facility, April 20, 2022 (left) and May 26, 2022 (right)*

63.   CalRecycle has issued NOVs[13] against the Facility for:

- Litter in and around the Facility, in violation of Cal. Code Regs., tit. 14, § 17867(a)(3) (April 24, 2018; November 20, 2020; December 22, 2020; January 19, 2021; February 19, 2021; March 24, 2021; April 27, 2021; May 25, 2021; June 24, 2021; July 22, 2021; August 18, 2021; September 15, 2021; October 20, 2021; November 19, 2021; December 17, 2021; January 19, 2022; March 17, 2022; April 20, 2022; May 26, 2022; June 23, 2022; June 30, 2022; July 13, 2022; July 21, 2022);

- Accepting and composting materials not authorized by permit, in violation of Pub. Resources Code, § 44004 (February 19, 2021; March 24, 2021; April 27, 2021; May 25, 2021; June 24, 2021; July 22, 2021; August 18, 2021; September 15, 2021; October 20, 2021; November 19, 2021; December 17, 2021; January 19, 2022; February 17, 2022; March 17, 2022; April 20, 2022; May 26, 2022; June 23, 2022; June 30, 2022; July 13, 2022; July 21, 2022);

---

[13] All CalRecycle Notices of Violation can be accessed online at: https://www2.calrecycle.ca.gov/SolidWaste/Site/Summary/4630/.

- Mislabeling mixed material as green material, in violation of Cal. Code Regs., tit. 14, § 17868.5(a) (February 19, 2021);

- Compost contamination, in violation of Cal. Code Regs., tit. 14, § 17867(a)(5) (February 17, 2022);

- Failure to sample compost before removal from Facility, in violation of Cal. Code Regs., tit. 14, § 17868.1(a) (February 17, 2022);

- Excessive pathogen levels in compost, in violation of Cal. Code Regs., tit. 14, § 17868.3(a) (March 23, 2022);

- Exceeding physical contamination limits, in violation of Cal. Code Regs., tit. 14, § 17868.3.1(a) (March 23, 2022);

- Exceeding maximum permitted wet tons of collected materials, in violation of Pub. Resources Code § 44022 (May 26, 2022);

- Accumulation of feedstock piles, in violation of Pub. Resources Code, § 44004 (June 23, 2022; July 21, 2022);

- Failure to control odor, in violation of Cal. Code Regs., tit. 14, § 17867(a)(2) (June 23, 2022; June 30, 2022; July 13, 2022; July 21, 2022);

- Failure to adhere to Odor Impact Mitigation Plan, in violation of Cal. Code Regs., tit. 14, § 17863.4 (June 23, 2022; June 30, 2022; July 13, 2022; July 21, 2022);

- Failure to provide fire prevention, protection, and control, in violation of Cal. Code Regs., tit. 14, § 17867(a)(9) (June 23, 2022; June 30, 2022; July 13, 2022; July 21, 2022); and,

- Failure to comply with permit terms and conditions, in violation of Pub. Resources Code, § 44014(b) (June 23, 2022).

64.    The Mojave Desert AQMD has issued NOVs against the Facility for:

- Failure to submit a Comprehensive Emissions Inventory Report, in violation of 40 CFR § 51, Subpt. A, California Clean Air Act ("CCAA") Health & Saf. Code §§ 39607, 44340-44342, and District Rule 204 (April

21, 2020);

- Burning combustible materials in open outdoor fire, causing nuisance, in violation of District Rules 402 and 444 (March 9, 2021); and,

- Discharging visible emissions into the atmosphere, causing nuisance in violation of District Rules 401 and 402 (January 6, 2022).

65.   In 2022 alone, the San Bernardino County Fire Department issued the Facility compliance violations for:

- Failure to update business plan within 30 days of change in material accepted, business information, or operations, in violation of Health & Saf. Code, §§ 25508.1(a)-(f) (February 9, 2022);

- Failure to annually review and electronically certify business plan before the required due date, in violation of Health & Saf. Code, § 25508.2 (February 9, 2022);

- Failure to submit a tank facility statement, in violation of Health & Saf. Code, § 25270.6(a)(1) (February 9, 2022);

- Failure to immediately report any release or threatened release of a hazardous material, in violation of Health & Saf. Code, § 25510(a) (June 10, 2022);

- Failure to make hazardous waste determination, in violation of 40 CFR § 262.1 (June 10, 2022);

- Failure to label stationary waste tanks as "hazardous waste" and mark with an accumulation start date, in violation of 40 CFR § 262.34(f) (February 9, 2022; June 23, 2022);

- Failure to accumulate hazardous waste in a container that is in good condition, in violation of 40 CFR § 262.34(d)(2) (June 23, 2022);

- Allowing multiple lidless 5-gallon buckets, partially filled with oil, to sit outside of a containment unit, in violation of 40 CFR § 262.34(d)(2) (June 23, 2022); and,

- Failure to meet safety requirements for containers holding hazardous waste, in violation of 40 CFR § 262.34(d)(2), 265.173 (June 23, 2022).

66.   Defendants have also engaged in hazardous and/or unauthorized dumping of harmful material.   On information and belief, since approximately June 2022, Defendants have been trucking rancid material off site of the Facility, located at or near W/SW Hwy 58 Helendale Road, Hinkley, California 93516, and dumping it in unmarked areas in the Mojave Desert and/or in unpermitted areas, resulting in Dump Sites.   These Dump Sites have emitted smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals into the surrounding areas. These Dump Sites pose a danger to the public and are often unmarked and not cordoned off.

67.   In addition, Defendants have been cited for repeatedly failing to prevent off-site litter migration into the surrounding desert ecosystem.   In particular, Defendants have failed to clean up prevalent film plastic litter, which has been found on the northeast of its property and frequently blows toward Hinkley, California.

### E.   Conditions Leading to the Fire

68.   As a result of Defendants' failure to operate the Facility in a reasonably safe manner, a compost pit caught fire on or around May 28, 2022 and fueled embers, smoke and emissions in the area surrounding the Facility and Dump Sites.

69.   Facility Defendants knew the risk of fire was likely.   It is general knowledge in the composting and biosolids community that compost must be carefully treated and monitored so as to avoid conditions that can lead to spontaneous combustion.[14]   It is precisely for this reason that the Facility is highly regulated by the San Bernardino County Fire Department, and must submit and maintain a Fire Prevention Plan pursuant to 29 C.F.R. § 1910.39.

70.   Facility Defendants' Fire Prevention Plan acknowledges that green waste storage and compost rows are potential ignition sources.   It further acknowledges that

---

[14] Rynk, *supra* note 7.

improper ventilation, oversized piles of compost, and a combination of wet and dry materials all are conditions that can lead to spontaneous combustion.  The Fire Prevention Plan states that the fire department or an in-house fire brigade should be on standby when beginning to fight compost fires, warning its reader: "Don't underestimate the damage - physical or political - a smoking fire can do."

71.  Correspondence between regulatory agencies show that Facility Defendants' Fire Prevention Plan failed to adequately address: (1) maximum stockpile dimensions; (2) sufficient water supply and storage; (3) adequate site personnel monitoring; (4) respiratory protection; and, (5) a site-specific health and safety plan for fire operations.

72.  Despite the Fire Prevention Plan, Facility Defendants were entirely underprepared for the Fire, which appears to have affected about half of the eighty-acre Facility.

73.  Despite the Fire Prevention Plan, Facility Defendants failed to properly ventilate piles of compost, stored materials in oversized piles, and mixed wet and dry materials.

74.  CalRecycle stated in its June 23, 2022 inspection report that "the piles [of compost] were large enough that prevented proper temperature monitoring and corrective action in a fire/smoldering event," and found "stockpiles of materials that are not organized in windrows" at the Facility.  Compost piles remained so large nearly one month after the Fire started that CalRecycle was unable to take an accurate temperature reading of the middle of the pile.

75.  As described above, Facility Defendants have been issued NOVs for collecting and housing more than the permitted amount of wet waste.  Facility Defendants have also been cited for accepting unpermitted wet materials that are neither green waste nor biosolids.  Excessively large piles of compost, and a mix of wet and dry materials in those piles, increase the chances of spontaneous combustion.  The characterization of unpermitted materials at the Facility is not fully known to Plaintiffs

1   at this time.

2        76.    Defendants knew or should have known that the Facility was accepting

3   excessive waste, accepting waste with excessive contamination levels, processing

4   unacceptable forms of waste, allowing litter to accumulate on the property and various

5   Dump Sites, failing to control fires at the Facility and/or Dump Sites, and engaging in

6   unpermitted off-site dumping.  Defendants further knew or should have known that they

7   were emitting smoke, noxious or offensive gases, odors, pollutants, toxins, physical or

8   particulate matter, contaminants and/or chemicals from the Facility and/or Dump Sites

9   into the surrounding area and that said materials were entering the properties of

10  Plaintiffs.

11       77.    The Fire is not the first to have broken out at the Facility.  The Facility has

12  seen five other compost fires between October 28, 2020 and January 5, 2022.

13   **F.     The Fertilizer Fire, Subsequent Smoldering, and Defendants'**

14   **Botched Response**

15       78.    In response to a Mojave Desert AQMD NOV issued in January 2022,

16  Facility Defendants adopted a Fire Prevention and Smoldering Material Management

17  Procedure (separate from the Fire Prevention Plan described above).  The procedure

18  states that if it appears there is an open flame fire, to contact the fire department.

19  Otherwise, operations staff is to control the smoldering piles.

20       79.    On May 28, 2022, at approximately 1:00 p.m., a pile of compost ignited,

21  leading to a fire that eventually spanned half the Facility (around forty acres).

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

80.    On information and belief, the Fire broke out as a result of spontaneous combustion.



*The Facility emitting smoke following the Fire*

81.    The Facility had multiple water trucks onsite on May 28, 2022.  However, all three of the Facility's water trucks were broken and unusable, per the San Bernardino County Fire Department incident report.  Despite the complete lack of water mitigation resources, Facility employees claimed they attempted to extinguish the Fire for roughly two hours before calling for assistance.



*West Coast Water Tenders truck and water at the Facility*

82.     The Yermo Fire Department arrived on scene at 3:52 p.m., and with the help of the Bureau of Land Management, unsuccessfully attempted to extinguish the acres-large fire.  The last firefighter left the scene on May 29, 2022 at 8:56 a.m., with the Fire still burning.  Local residents were not informed of the fire or of its health risks.

83.     Facility Defendants contracted with private water and firefighting company, West Coast Water Tenders, to continue fighting the Fire after the Yermo Fire Department and Bureau of Land Management left the Facility.

84.     Facility Defendants claim they informed the Mojave District AQMD of the Fire on May 29, 2022, and the Lahontan Region Water Quality Control Board and San Bernardino Department of Public Health sometime thereafter.  A volunteer fire fighter informed the California Air Resources Board and CalEPA around May 31, 2022 of the Fire.  Facility Defendants did not call the Office of Emergency Services, which handles hazardous materials reporting, to report the Fire and discharge of toxic air contaminants until *June 11, 2022*.

85.     The San Bernardino County Fire Department continued to detect visible smoke in the air at least until June 10, 2022.  The Fire continues smoldering as of the date of this filing, more than four months after the Fire broke out.

86.     The material fueling the Fire was compost, made up of human fecal matter (biosolids), green waste (such as tree trimmings), and other materials and litter present in and around the Facility, including plastics and brewery waste.



*Continued smoldering and attempts at fire mitigation, July 21, 2022*

87.     The high desert winds quickly carried the Fire's smoke, stench, and contaminated air toward the downwind communities of Hinkley, Barstow, and Victorville.  Local residents were exposed to the nauseating odor and smoke from the Fire.  A strong odor remained at least until July 13, 2022, more than six weeks after the Fire started.

88.     The conditions at the Facility and Dump Sites, and their effect on the surrounding area, fueled complaints of ailments by members of the public who live, work, and/or engage in activities and/or recreation in the areas surrounding the Facility and Dump Sites.  Residents and others in this area have reported pungent and unbearable odors, smoke and matter in the air.  There have also been reports of headaches, nausea, respiratory problems and animal illness.

89.     On information and belief, Facility Defendants also have an unpermitted practice of dumping biosolids and other materials off-site.

90.     In the months following the Fire, Plaintiffs and other area residents noticed large trucks transporting what appeared to be compost and/or biosolids, including burnt materials, and dumping the contents onto a nearby plot of land near a solar power plant on Harper Lake Road in Hinkley.

91.     As of June 27, 2022, CalRecycle regulators were investigating Facility Defendants for the unpermitted off-site dumping.[15]

/ / /

/ / /

/ / /

/ / /

/ / /

---

[15] Charlie McGee, Victorville Daily Press, *San Bernardino, state regulators investigating off-site dumps from High Desert waste pit fire site* (June 27, 2022) https://www.vvdailypress.com/story/news/2022/06/27/synagro-technologies-goldman-sachs-high-desert-waste-pit-harmful-dumps-being-investigated-hinkley/7740864001/?fbclid=IwAR3AP5J-RzwwJt-qCJUUJgWcvrCa-3Ciw9jgi610qsWZ2niBUNWzjk20Nq8.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

### G. Effects of the Fire

92.     Local residents felt the effects of the Fire almost immediately.  In the two months immediately following the Fire, the Mojave Desert AQMD received 196 odor and air contamination complaints against Facility Defendants alone.[16]

93.     Residents described the Fire as smelling of feces, "the smell of death," and being nauseating.  Immediately following the Fire, residents suffered from "nonstop headaches," asthma and other respiratory problems, and nausea and vomiting.[17]

94.     Almost immediately after the Fire broke out, residents began to find dead wild animals around the area.  Much to their devastation, residents also discovered their own previously healthy, beloved pets dropping dead. [18]

95.     Plaintiffs' home and community became trapped in a plume of toxic smoke, with no way to shelter themselves and nowhere to go.  Temperatures in the area in the months following the Fire consistently reached 90 to 100 degrees.  Residents could not close their doors and turn on central air conditioning to protect themselves; the majority of Hinkley homes are not fitted with central, filtered, or forced air.  Rather, they were compelled to either keep doors and windows open for relief from the heat, exposing themselves to contaminated air, or close their doors and run their swamp coolers, which circulated the foul-smelling, contaminated air into and around their homes.  Residents had nowhere to turn, and Defendants failed to offer relocation or any form of assistance to Plaintiffs and residents.

96.     Following the Fire, local residents' swamp coolers became black from soot and coated in brown sludge.  Residents were forced to change their swamp cooler filter

---

[16] Charlie McGee, Victorville Daily Press, *Synagro waste fire fuels 144% air-complaint spike in Mojave Desert; $1M fines on table* (July 21, 2022), https://www.vvdailypress.com/story/news/2022/07/21/synagro-waste-fire-fuels-144-spike-mojave-desert-air-complaints/10092944002/.

[17] Charlie McGee, Victorville Daily Press, *'Smell of death': Health concerns mount as 80-acre High Desert waste pit burns* (June 3, 2022), https://www.vvdailypress.com/story/news/2022/06/03/health-concerns-arise-high-desert-waste-pit-burns/7485972001/.

[18] *Id*.

pads on a regular basis, a noticeable change after the Fire began.   Absent air contamination at this level, a swamp cooler filter pad should only require replacement every one to two years.



*Hinkley swamp cooler coated in sludge, July 25, 2022*

97.     Burnt materials from the Fire have settled onto Plaintiffs' and local residents' properties, contaminating pond water and water dishes left out for animals, damaging their real and personal property.

98.     Air monitoring results from the Mojave District Air Quality Management District confirm elevated levels of particulate matter ("PM") 2.5 and PM 10 in Barstow, 14 miles to the east, during the Fire.

99.     Defendants took no steps to measure concentration levels of air contaminants or warn the public.   To Plaintiffs' knowledge, no air monitors were installed and no air samples were taken by Defendants.   Defendants also failed to take corrective action or fully disclose the dangerous conditions at the Facility.   Defendants continue to accept excessive waste, failed to control the fires at the Facility and/or Dump Sites, improperly dump waste off site, put mixed waste and unpermitted waste into the

1  composing pit, allow waste and litter to accumulate on the property and various Dump

2  Sites, process unacceptable forms of waste, and/or operate the Facility and Dump Site

3  in a manner that causes smoke, noxious or offensive gases, odors, pollutants, toxins,

4  physical or particulate matter, contaminants and/or chemicals to emanate into the

5  surrounding area and enter the properties of Plaintiffs.

6      100.   Due to the high levels of biosolids and other toxic air pollutants which

7  continued to burn and contaminate the air for months, Plaintiffs claim damages for

8  physical injury, fear of future physical injury, increased risk of future injury, emotional

9  distress, harm to real and personal property, medical expenses, and economic damages,

10  for which many have sought medical treatment.

11      101.   Since the Fire began, children have been unable to play outside.  Adored

12  pets have perished.  Residents of the affected communities have become ill.

13      102.   Plaintiffs' injuries include but are not limited to eye irritation, skin

14  irritation, headaches, nausea, nose irritation, throat (upper respiratory) irritation, lung

15  (lower respiratory) irritation, dizziness, abdominal discomfort, and other related

16  symptoms, as well as other harms not yet known.  Plaintiffs are informed and believe,

17  and thereon allege, that some or all the health effects may result in chronic and/or

18  ongoing injuries.

19      103.   As a direct, proximate and substantial cause of Defendants' conduct and

20  the dangerous conditions at the Facility and Dump Sites, Plaintiffs suffered harm (and

21  continue to suffer) and sustained damages including, but not limited to, property

22  damage, personal injury, loss of use, lost income, loss of enjoyment of their properties,

23  and/or annoyance, discomfort and inconvenience, among other things.

24      104.   As alleged herein, the dangerous conditions at the Facility and/or Dump

25  Sites and Defendants' improper operation of said Facility and/or Dump Sites have

26  caused smoke, noxious or offensive gases, odors, pollutants, toxins, physical or

27  particulate matter, contaminants and/or chemicals to emanate into the surrounding area

28  and enter the properties of Plaintiffs.

105.   The materials and particulate matter, which emanate from the Facility and Dump Sites, create an unbearable and noxious odor that is foul and pungent.  In addition to the smell, these noxious materials have caused illness among members of the public. In addition, nearby residents have reported the smell of death and pets that are sick and dying.   Among other things, Plaintiffs have suffered and continue to suffer personal injuries and physical ailments as a result of Defendants' conduct.  Conditions are so bad that at times there has been ash and particulate matter falling from the sky.

106.   Despite this, Defendants have continued their operations at the Facility and the dangerous conditions persist.  As a result, Defendants' conduct and the dangerous conditions at the Facility and Dump Sites have rendered Plaintiffs' properties unsafe and unfit for use, and have caused injuries to Plaintiffs.

107.   As a direct, legal, proximate and substantial result of Defendants' conduct, Plaintiffs have suffered damages and harm, including but not limited to the following: (1) property damage; (2) loss of use, benefit, goodwill, diminution in value and/or enjoyment of their property; (3) loss of income; (4) damage to home filtration/cooling systems; (5) damage to personal property; (6) other consequential economic losses; (7) mental pain and suffering including worry, emotional distress, anguish, anxiety and nervousness; (8) annoyance, discomfort and inconvenience; (9) personal and physical injuries; (10) medical expenses; and/or (11) loss of earning capacity.

## VI.   BASIS FOR MEDICAL MONITORING DAMAGES

108.   Defendants have exposed Plaintiffs to excessive levels of air contaminants from biosolids, and other chemicals and toxins proven hazardous to human health.

109.   Defendants have also exposed Plaintiffs to environmental conditions proven hazardous to mental health.

110.   The exposure to these dangerous substances and conditions is such that Plaintiffs have been placed at an increased risk of contracting latent illness and disease, including but not limited to respiratory, cardiovascular, neurological, and mental health issues, and as such, require medical monitoring which Defendants are responsible for

providing and paying for.

111.   Monitoring and testing procedures for respiratory, cardiovascular, and neurological disorders and other illnesses associated with exposure to biosolids and other chemicals exist, as well as for mental health issues, which make the early detection and treatment of such diseases and health conditions possible and beneficial.

112.   Medical monitoring is a reasonably certain consequence of Plaintiffs' toxic exposure.

113.   Accordingly, Plaintiffs are entitled to compensatory damages for the cost of medical monitoring.

## VII.   **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

### **NEGLIGENCE**

### **(By Plaintiffs Against All Defendants)**

114.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

115.   At all relevant times, Defendants owned, operated, inspected, controlled, managed, and/or maintained the Facility.

116.   At all relevant times prior to this incident, Defendants had the duty to exercise the utmost care and diligence in the ownership, design, operation, management, supervision, inspection, maintenance, repair, and/or control of the Facility in compliance with relevant regulations and industry standards, so as not to cause harm to individual persons, private and public property, the environment, public resources, public health, and/or the comfortable use and enjoyment of property and life by the public.

117.   As the owners, operators, lessees, managers, and/or proprietors of the Facility and Dump Sites, Defendants owed a nondelegable duty, including to Plaintiffs, to use reasonable care to keep the premises in a reasonably safe condition.  This included, among other things, a duty to protect against reasonably foreseeable risks of injury that might result from dangerous conditions at said Facility and Dump Sites (i.e. on

Defendants' property) and a duty to operate the Facility and Dump Sites in a manner that did not harm others, harm others' property, or interfere with others' use of their property. As the operators and users of the Facility and Dump Sites, Defendants further had a duty: (1) to take reasonable and ordinary care to prevent a dangerous condition at the Facility and Dump Sites; (2) to take reasonable and ordinary care to minimize the risk of fire at the Facility and Dump Sites, unauthorized fires and/or uncontrolled fires; (3) to use reasonable care to prevent dangerous conditions that would cause offensive matters to emanate from the Facility and Dump Sites including but not limited to smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter, toxins contaminants and/or chemicals; (4) to take reasonable care not to create or maintain conditions at the Facility and Dump Sites that would cause harm or damage to Plaintiffs or their properties; (5) to prevent the emanation of offensive matters from the Facility and Dump Sites including but not limited to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals, among other things; and (6) to take reasonable and ordinary care to prevent injuries to Plaintiffs arising from Defendants' conduct and operation of the Facility and Dump Sites. These duties were nondelegable.

118. At all relevant times, Defendants negligently, carelessly, recklessly, and/or unlawfully used, owned, operated, managed, supervised, maintained, repaired, and/or

controlled the Facility, including but not limited to accepting unpermitted waste products, allowing fugitive discharge of biosolids and other chemicals from the site and/or failing to timely mitigate or repair fugitive discharge of emissions and other chemicals from the site.

119. Defendants breached their duty by, among other things: (1) allowing, creating, permitting and/or maintaining a dangerous condition at the Facility and Dump Sites; (2) operating the Facility and Dump Sites in a manner that foreseeably caused a fire, unauthorized fire and/or uncontrolled fire; (3) operating the Facility and Dump Sites

in a manner that results in offensive matters emanating from the Facility and Dump Sites including but not limited to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals; (4) creating a hazardous condition; (5) allowing, creating and/or maintaining conditions at the Facility and Dump Sites that harmed or damaged Plaintiffs and/or their property; (6) interfering with Plaintiffs' use and enjoyment of their properties; (7) failing to supervise the maintenance, design, construction and/or operation of the Facility and Dump Sites; (8) failing to supervise the employees of the Facility, Dump Sites and/or the Defendants; and/or (9) causing injuries to Plaintiffs through their conduct and operation of the Facility and Dump Sites.  At all times relevant herein, Defendants planned, constructed, operated, designed, altered, used and/or maintained the Facility and Dump Sites in a dangerous condition.

120.   Defendants were negligent per se based on their violations of the following rules, regulations, and statutes, among others:

a.   Cal. Code Regs., tit. 14, § 17867(a)(3) (litter in and around the Facility)

b.   Pub. Resources Code, § 44004 (accepting and composting materials not authorized by permit)

c.   Pub. Resources Code, § 44022 (exceeding maximum permitted wet tons of collected materials)

d.   Pub. Resources Code, § 44004 (allowing accumulation of feedstock piles)

e.   Cal. Code Regs., tit. 14, § 17867(a)(2) (failure to control odor)

f.   Cal. Code Regs., tit. 14, § 17863.4 (failure to adhere to Odor Impact Minimization Plan)

g.   Cal. Code Regs., tit. 14, § 17867(a)(9) (failure to provide fire prevention, protection, and control)

h.   Cal. Code Regs., tit. 14, § 17869(b) (failure to keep records of special occurrences, i.e. smolders and fires)

i. Mojave Desert AQMD Rule 402 (creating a nuisance)

j. Mojave Desert AQMD Rule 444 (burning combustible materials in open outdoor fire)

k. Mojave Desert AQMD Rule 401 (discharging visible emissions into the atmosphere)

l. Cal. Code Regs., tit. 22, § 66264.31 (failure to maintain and operate the Facility to minimize the possibility of fire).

121.   Defendants' violations of California laws, regulations and statutes, as alleged herein, were a substantial factor in bringing about the harm suffered by Plaintiffs.

122.   The harm and/or injury that resulted from Defendants' conduct was the nature of which the laws, statutes, or regulations (including but not limited to (1) California Public Resources Code, section 44002; (2) California Code of Regulations, Title 14, Section 17867; and (3) California Public Resources Code, section 44004) were designed to prevent.

123.   Plaintiffs, who suffered injury as a result of Defendants' conduct, were of the class of persons for whose protection the above laws and regulations were adopted.

124.   Defendants negligently, carelessly, recklessly and without due regard to the safety of Plaintiffs, created, permitted, continued, and/or maintained an unreasonably dangerous and unsafe condition at the Facility and Dump Sites.  As alleged herein, Defendants received more than the daily maximum tonnage of waste, allowed excessive waste to accumulate on the property, contaminated the Facility with unpermitted forms of waste, processed unpermitted forms of waste, unreasonably mixed waste, failed to prevent off-site litter migration, and/or engaged in off-site dumping of unpermitted waste.  In addition, Defendants have created, maintained, permitted and/or allowed an uncontrolled fire to burn at the Facility and/or Dump Sites, emitting smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter and/or chemicals.   These conditions were dangerous in that they created a foreseeable risk of harm.  They also created a foreseeable risk that smoke, noxious or offensive gases, odors,

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1   pollutants, toxins, physical or particulate matter and/or chemicals would be released

2   from the Facility and/or Dump Sites into the surrounding area, harming Plaintiffs and/or

3   their property.

4       125.   The risk of fire and the emission of smoke, noxious or offensive gases,

5   odors, pollutants, contaminants, particulate matter, toxins and/or chemicals was

6   reasonably foreseeable, if not expected, by a reasonable and prudent person and were

7   reasonably foreseeable and to be expected by Defendants.  As further alleged herein, the

8   dangerous condition created a reasonably foreseeable risk of the kind of harm which

9   occurred.

10      126.   Defendants had actual or constructive notice of the dangerous conditions at

11  the Facility and/or Dump Sites.  As operators of the Facility, Defendants knew or should

12  have known that the release of smoke, noxious or offensive gases, odors, pollutants,

13  toxins, physical or particulate matter, contaminants and/or chemicals was likely to occur

14  as a result of their conduct (including but not limited to their acceptance of excessive

15  waste, mixing of waste, off-site dumping of waste, etc.), as alleged herein, and they

16  failed to take corrective action(s).

17      127.   Defendants placed the Facility and Dump Sites in a dangerous condition

18  and had other means available to take alternative action that would not have created the

19  dangerous conditions.  In addition, Defendants had sufficient time prior to the injuries

20  alleged herein to take measures to protect against the dangerous condition and/or correct

21  the dangerous condition.   Defendants have been repeatedly cited for violations of

22  California Regulations, including for their acceptance of excessive waste and

23  contaminating the Facility pit with unpermitted forms of waste.  Defendants, however,

24  did not take any measures to protect against the dangerous conditions at the Facility or

25  correct the dangerous conditions.

26      128.   As a direct, proximate, and substantial result of Defendants' negligence,

27  Plaintiffs suffered damages and injuries including, but not limited to, property damage,

28  destruction of  and/or damage to real and personal property, physical injury, medical

expenses, loss of income, restoration costs, loss of earning capacity, loss of goodwill, loss of use, benefit, goodwill and diminution in value and/or enjoyment of such property, loss of profits, economic damages, mental pain and suffering, worry, emotional distress, anguish, anxiety, nervousness, among other things.  As alleged herein, Plaintiffs lost the use and enjoyment of their property, incurred expenses as a consequence of that loss and the emanation of noxious odors, and/or suffered personal injuries.  As further alleged herein, Plaintiffs have therefore suffered damages in an amount to be proven at trial, but believed to be above this Court's jurisdictional minimum.

129.   As a direct and proximate result of the wrongful acts and/or omissions of the Facility Defendants and each of them, Plaintiffs have suffered damages, including but not limited to inhalation of noxious and toxic gases, chemicals, and/or fumes resulting in personal injuries including, but not limited to, headaches, vomiting, nausea, asthma and other respiratory problems, and other harms known that are as yet unknown. Upon information and belief, some or all the health effects may result in permanent impairments and/or disabilities, all to their general damage in a sum according to proof.

130.   As a direct and proximate result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have suffered damages, including but not limited to emotional distress and worry, which is ongoing.

131.   As a direct and proximate result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs are required to, and continue to, employ physicians and/or other health care providers to examine, treat, and care for their injuries. Plaintiffs have incurred, and will continue to incur, medical and incidental expenses for such examination, treatment, rehabilitation, and care, all in an amount according to proof.

132.   As a direct and proximate result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have been put at risk for the development of latent health problems, such that they now – and will in the future – require medical monitoring for such problems.

133.   As a direct and proximate result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have incurred, and will continue to incur, a loss of income and/or a loss of earning capacity, all in an amount according to proof.

134.   As a direct and proximate result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have incurred, and will continue to incur, a loss of revenues and profits from the operation of their businesses, all in an amount according to proof.

135.   As a direct and proximate result of the wrongful acts and/or omissions of Defendants and each of them, Plaintiffs have suffered and will continue to suffer the loss of the quiet use and enjoyment of their property, as well as public properties located in the area, have suffered and will continue to suffer the diminution of the value of their property, and/or have been or will be required to expend monies to repair and/or restore the property to its prior condition, all in an amount according to proof.

136.   The wrongful acts and/or omissions of Defendants and each of them, were done maliciously, oppressively, fraudulently, and/or in conscious disregard of the health and safety of Plaintiffs and their community.

137.   Defendants had actual and/or constructive knowledge of previous fugitive discharge of biosolids and other chemicals from the Facility.  Defendants knew or should have known that failure to maintain its biosolids properly increased the risk of said material catching fire.  Defendants knew, or should have known, that failure to maintain, inspect, replace, and/or repair their firefighting equipment, including firefighting and water trucks, and infrastructure containing biosolids and other chemicals would reasonably increase the probability of a catastrophic event, such as a toxic fire, which foreseeably would lead to injuries to the health and safety of Plaintiffs and their community, generally.

138.   Defendants had actual and/or constructive knowledge that composting unpermitted materials, and amounts in excess of their permits, would pose, and did pose, a significant threat of fire that could lead to air contamination.  Defendants also knew,

1   or should have known, that accumulating large piles of biosolids without regular aeration

2   would pose, and did pose, a significant threat of fire.  Defendants also knew, or should

3   have known, that failure to maintain, inspect, replace, and/or repair the composting

4   equipment and infrastructure in the Facility and surrounding area would reasonably

5   increase the probability of a catastrophic event, such as an uncontrollable fire, which

6   foreseeably would lead to injuries to the health and safety of Plaintiffs and their

7   community, generally.

8   139.  Despite their prior knowledge, Defendants allowed their firefighting

9   equipment, including firefighting and water trucks, to be inoperable such that

10  Defendants were unable to fight the fire, resulting in the need to bring in third-party

11  firefighters, further exacerbating the damages to Plaintiffs, and in conscious disregard

12  of the known risks to nearby communities and their residents, including Plaintiffs.

13  140.  In failing to contain illicit discharge(s) into the atmosphere, Defendants

14  created a substantial risk of injury to Plaintiffs and the community of residents living

15  near the Facility generally.  Defendants' illicit discharge(s) into the atmosphere were a

16  direct and proximate cause of Plaintiffs' injuries.  On information and belief, Defendants

17  concealed important information regarding discharge(s) from its facilities relating to

18  Plaintiffs' personal health.  Plaintiffs are entitled to punitive and exemplary damages in

19  an amount to be ascertained which is appropriate to punish or set an example of

20  Defendants and deter such behavior by Defendants and others in the future.

21  ## SECOND CAUSE OF ACTION

22  ## STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

23  ### (By Plaintiffs Against Facility Defendants)

24  141.  Plaintiffs incorporate by reference all allegations of the preceding

25  paragraphs as though fully set forth herein.

26  142.  At all times herein, Facility Defendants collectively were the owner and

27  operator of the Facility.

28  / / /

1      143.   At all times relevant to this action, Facility Defendants had supervision,

2  custody, and control of the Facility.

3      144.   At all times relevant to this action, Facility Defendants were under a

4  continuing duty to protect Plaintiffs from the natural consequences of handling

5  combustible biosolids at the Facility.

6      145.   Facility Defendants were engaged in an ultrahazardous activity by

7  handling, transporting, housing, composting, and distributing biosolids, including

8  human feces, solid waste, sewage, green waste, and/or other substances containing

9  flammable and toxic materials at the Facility.

10      146.   Defendants further elected to keep a dangerous condition at their Facility

11  including through the acceptance of excessive waste, the accumulation of waste and

12  litter on the property, the inclusion of mixed materials in their composting pit, processing

13  unpermitted waste, allowing or creating uncontrolled fires at the Facility (and/or Dump

14  Sites) and engaging in unpermitted, off-site dumping.

15      147.   Plaintiffs have suffered harm as a result of Facility Defendants' conduct as

16  described herein including but not limited to: physical injury, loss of use and enjoyment

17  of their homes, loss of their pets and other personal property, and other expenses.

18      148.   The injuries sustained by Plaintiffs as a result of Facility Defendants'

19  conduct described herein were the direct and proximate result of Facility Defendants'

20  activities.

21      149.   The harm to Plaintiffs was and is the kind of harm that would be reasonably

22  anticipated as a result of the risks created by handling combustible biosolids.

23      150.   Facility Defendants' harm to Plaintiffs was foreseeable because a fire

24  discharging burnt biosolids and other materials from the Facility would reasonably result

25  in a significant environmental impact on the surrounding communities.

26      151.   Facility Defendants' operation and use of the Facility and resulting

27  discharge was and remains a substantial factor in causing the harms suffered by

28  Plaintiffs.

152.   Facility Defendants are liable to Plaintiffs for all damages arising from this ultrahazardous activity pursuant to Cal Civ. Code § 3294, and attorney's fees pursuant to Cal Civ. Code § 1021.5.

153.   Facility Defendants are liable to Plaintiffs for all damages arising from their violations of Cal. Code Regs., tit. 14, §§ 17867, 17863.4, 17869, Cal. Code Regs., tit. 22. § 66264.31, Pub. Resources Code §§ 44004, 44022 pursuant to California Civil Code section 3294, and attorneys' fees pursuant to California Code of Civil Procedure section 1021.5.

154.   The wrongful acts, representations and/or omissions of Facility Defendants, hereinabove set forth, were made, adopted, approved, authorized, endorsed and/or ratified by their officers, directors or managing agents, and were done maliciously, oppressively, fraudulently and/or with a willful and knowing disregard of the probable dangerous consequences for the health and safety of Plaintiffs and their community.

155.   The officers, directors and/or managing agents of Facility Defendants had advanced knowledge of the collection, storing, and composting of biosolids.   The officers, directors and/or managing agents of Facility Defendants had advanced knowledge that a failure to properly store, maintain, and aerate the biosolids within the Facility, and a failure to maintain proper fire-fighting equipment on-site, would result in the probability of a catastrophic fire, which foreseeably would lead to harm and/or injuries to the health and safety of Plaintiffs and their community, generally.

156.   In failing to take protective measures to safeguard against the danger, the officers, directors and/or managing agents of Defendants acted with a willful and/or knowing disregard of the probable dangerous consequences, and/or acted with an awareness of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences, thereby creating a substantial risk of injury to Plaintiffs and the surrounding community.

/ / /

/ / /

**THIRD CAUSE OF ACTION**

**PRIVATE NUISANCE – CONTINUING**

**(By Plaintiffs Against Facility Defendants)**

157.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

158.   Plaintiffs own and/or occupy property at or near the exposed area.  At all relevant times, Plaintiffs had a right to occupy, enjoy, and/or use their property without interference by Facility Defendants.

159.   Facility Defendants by reason of their wrongful acts and/or omissions created a condition that (a) was harmful to Plaintiffs' health, including but not limited to causing nausea and vomiting, headaches, asthma, and other respiratory problems; (b) was indecent and/or offensive to Plaintiffs' senses by emitting a noxious smell from which Plaintiffs were unable to escape; (c) was an obstruction of Plaintiffs' free use and enjoyment of their property, so as to interfere with their comfortable enjoyment of life and/or  property; and/or (d) unlawfully obstructed Plaintiffs' free passage or use, in the customary manner, of public parks, squares, streets, and/or highways in the exposed area.

160.   Defendants' actions, conduct, omissions, negligence, trespass and failure to act resulted in the dangerous conditions at the Facility and Dump Sites, a foreseeable obstruction to the free use of Plaintiffs' property, and the release of smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter, toxins, contaminants and/or chemicals into the area surrounding the Facility and Dump Sites.  In addition, Defendants' actions, conduct, omissions, negligence, trespass and failure to act also obstructed Plaintiffs' free use of their property, interfered with their comfortable enjoyment of said property, and caused them unreasonable harm and substantial actual damages constituting a nuisance.

161.   The exposure and Facility Defendants' operation of the Facility has created an ongoing condition that is harmful to health and interferes with the comfortable

1  enjoyment of life and property.   Plaintiffs did not consent to Facility Defendants'
2  conduct.

3  162.   Defendants' conduct created a condition and/or permitted a condition to
4  exist, including but not limited to the release of noxious gases, odors and particulate
5  matter, that was harmful to health and was dangerous in that it was unsanitary and
6  created a risk of illness, damaged personal property and/or was offensive to the senses.
7  In addition, Defendants' conduct substantially interfered with Plaintiffs' use and
8  enjoyment of their property, was offensive to the senses, caused physical injuries, was a
9  fire hazard and posed a dangerous condition to Plaintiffs and their properties.

10  163.   An ordinary person of reasonable sensibilities would reasonably be
11  annoyed and/or disturbed by the conduct of Facility Defendants and fictitiously named
12  Defendants as described herein.

13  164.   The seriousness of Plaintiffs' injuries outweighs any public benefit from
14  any of Facility Defendants and fictitiously named Defendants' conduct as described
15  herein.

16  165.   As a direct and proximate result of the wrongful acts and/or omissions of
17  Facility Defendants and fictitiously named Defendants, Plaintiffs have suffered, and will
18  continue to suffer, discomfort, annoyance, anxiety, fear, worries, and stress attendant to
19  the interference with Plaintiffs' occupancy, possession, use, and/or enjoyment of their
20  property, as alleged above.

21  166.   As a direct and proximate result of the wrongful acts and/or omissions of
22  Facility Defendants and fictitiously named Defendants, Plaintiffs suffered and continue
23  to suffer damages as herein above set forth.

24  167.   The conduct of each Facility Defendant was a substantial factor in causing
25  harm to Plaintiffs who have suffered and continue to suffer economic harm, injury, and
26  losses, including injury to property.   Plaintiffs are entitled to damages for all such past
27  and present injuries.

28  / / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

168.   The exposure described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

169.   Plaintiffs are informed and believe, and on that basis allege, that the nuisance is continuing.

170.   To remedy the harm caused by Facility Defendants' nuisance Plaintiffs will seek injunctive relief, including without limitation an order requiring Facility Defendants to: (1) create a fund for the cost of medical monitoring to monitor the health of Plaintiffs and diagnose at an early stage any illnesses associated with exposure to the specific toxic substances generated by the Fire, including biosolids, released as a result of the Fire, and other chemical released as a result of the Fire; (2) repair and restore areas impacted by the Fire and resulting production and release of toxic smoke in and around the area; (3) prevent Facility Defendants from operating the Facility without adequate safety precautions and ongoing monitoring to ensure no future risk of fires or other catastrophic event occurs; and (4) prevent Facility Defendants from storing or processing biosolids on unpermitted sites in Hinkley and the surrounding area.

171.   Plaintiffs further seek compensatory damages for annoyance, discomfort, emotional distress, mental anguish, and harm to Plaintiffs' person and property.

172.   In maintaining the nuisance, which is continuing, Facility Defendants and fictitiously named Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Facility Defendants and fictitiously named Defendants were done with malice, fraud and/or oppression as described herein. As such, Plaintiffs are entitled to exemplary damages.

## FOURTH CAUSE OF ACTION

## PRIVATE NUISANCE – PERMANENT

### (By Plaintiffs Against Facility Defendants)

173.   Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

/ / /

174.   Plaintiffs own and/or occupy property at or near the exposed area.  At all relevant times, Plaintiffs had a right to occupy, enjoy, and/or use their property without interference by Facility Defendants.

175.   Facility Defendants by reason of their wrongful acts and/or omissions created a condition that (a) was harmful to Plaintiffs' health, including but not limited to causing nausea and vomiting, headaches, asthma, and other respiratory problems; (b) was indecent and/or offensive to Plaintiffs' senses by emitting a noxious smell from which Plaintiffs were unable to escape; (c) was an obstruction of Plaintiffs' free use and enjoyment of their property, so as to interfere with their comfortable enjoyment of life and/or  property; and/or (d) unlawfully obstructed Plaintiffs' free passage or use, in the customary manner, of public parks, squares, streets, and/or highways in the exposed area.

176.   This permanent condition has interfered with Plaintiffs' free use and enjoyment of their land, along with numerous other neighbors, in the form of damage to buildings, a significant decrease in the value of the property, exposure to an array of toxic substances on the land, and/or a lingering and foul smell of toxic gases, permeating the air surrounding their property and invading their homes.

177.   The exposure and Facility Defendants' operation of the Facility has created an ongoing condition that is harmful to health and interferes with the comfortable enjoyment of life and property.  Plaintiffs did not consent to Facility Defendant's conduct.

178.   Plaintiffs did not consent to the conduct of Facility Defendants and fictitiously named Defendants, which was a substantial factor in causing Plaintiffs' harm.

179.   An ordinary person of reasonable sensibilities would reasonably be annoyed and/or disturbed by the conduct of Facility Defendants and fictitiously named Defendants.

/ / /

180.   The seriousness of the harm outweighs any public benefit of any of Facility Defendants and fictitiously named Defendants' conduct.

181.   As a direct and proximate result of the wrongful acts and/or omissions of Facility Defendants and fictitiously named Defendants, Plaintiffs have suffered, and will continue to suffer, discomfort, annoyance, anxiety, fear, worries, and stress attendant to the interference with Plaintiffs' occupancy, possession, use, and/or enjoyment of their property, as alleged above.

182.   As a direct and proximate result of the wrongful acts and/or omissions of Facility Defendants and fictitiously named Defendants, Plaintiffs suffered and continue to suffer damages as herein above set forth.

183.   The exposure described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

184.   Plaintiffs are informed and believe, and on that basis allege, that the nuisance is permanent.

185.   To remedy the harm caused by Facility Defendants' nuisance Plaintiff will seek injunctive relief, including without limitation an order requiring Facility Defendants to: (1) create a fund for the cost of medical monitoring to monitor the health of Plaintiffs and diagnose at an early stage any ailments associated with exposure to toxic chemicals, including biosolids, produced and released as a result of the Fire; (2) repair and restore the areas impacted by the fire and resulting production and release of toxic gas in and around the area; (3) immediately cease operations and close down the Facility; and (4) prevent Facility Defendants from storing or processing biosolids on unpermitted sites in Hinkley and the surrounding area.

186.   Plaintiffs further seek compensatory damages for annoyance, discomfort, emotional distress, mental anguish, and harm to Plaintiffs' person and property.

187.   In maintaining the nuisance, which is continuing, Facility Defendants and fictitiously named Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants and fictitiously named

1  Defendants were done with malice, fraud and/or oppression as described herein.  As

2  such, Plaintiffs are entitled to exemplary damages.

3  ### FIFTH CAUSE OF ACTION

4  ### PUBLIC NUISANCE – CONTINUING

5  **(By Plaintiffs Against Facility Defendants)**

6  188.   Plaintiffs incorporate and re-allege each of the paragraphs above as though

7  fully set forth herein.

8  189.   Plaintiffs own and/or occupy property at or near the exposed area. At all

9  relevant times, Plaintiffs had a right to occupy, enjoy, and/or use their property without

10  interference by Facility Defendants.

11  190.   Facility Defendants, by reason of their wrongful acts and/or omissions

12  created a condition that has affected a substantial number of people at the same time in

13  the form of (a) a significant decrease in the value of the property, (b) exposure to an

14  array of toxic substances, and/or (c) a lingering smell of noxious fumes permeating

15  homes, schools, churches, retail and service business establishments in the area where

16  they live and raise their families.

17  191.   The condition that Facility Defendants created and/or permitted to exist

18  affected a substantial number of people within the general public, including causing

19  Plaintiffs to relocate, personal injuries and disturbance in the enjoyment of everyday

20  living.

21  192.   An ordinary person of reasonable sensibilities would reasonably be

22  annoyed and/or disturbed by the condition created by each and every Facility Defendant.

23  193.   The seriousness of the harm outweighs the social utility of the conduct of

24  any Facility Defendants.

25  194.   Plaintiffs did not consent to the conduct of any Facility Defendants as

26  described herein.

27  195.   As a direct and proximate result of the wrongful acts and/or omissions of

28  Facility Defendants and each of them, Plaintiffs suffered harm that is different from the

type of harm suffered by the general public.  Specifically, Plaintiffs have lost the occupancy, possession, use, and/or enjoyment of their land, real property, and/or personal property, including but not limited to, a reasonable and rational fear that the area is still dangerous, a diminution in the fair market value of their property, an impairment of the salability of their property, and/or exposure to an array of toxic substances on their property.  Further, Plaintiffs have experienced physical ailments, including but not limited to, nausea and vomiting, dizziness, headaches, and respiratory illnesses.  Plaintiffs are entitled to damages for all such past and present injuries.

196.   As a direct and proximate result of the wrongful acts and/or omissions of Facility Defendants, Plaintiffs suffered and continue to suffer damages as described above and, in an amount, according to proof at trial.

197.   The exposure described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

198.   Plaintiffs are informed and believe, and on that basis allege, that the nuisance is continuing.

199.   To remedy the harm caused by Facility Defendants' nuisance Plaintiff will seek injunctive relief, including without limitation an order requiring Facility Defendants to: (1) create a fund for the cost of medical monitoring to monitor the health of Plaintiffs and diagnose at an early stage any ailments associated with exposure to toxic substances, including biosolids, produced and released as a result of the Fire; (2) repair and restore the areas impacted by the fire and resulting production and release of toxic gas in and around the area; (3) prevent Facility Defendants from operating the Facility without adequate safety precautions and ongoing monitoring to ensure no future risk of discharge or other catastrophic event occurs; and (4) prevent Facility Defendants from storing or processing biosolids on unpermitted sites in Hinkley and the surrounding area.

200.   Plaintiffs further seek compensatory damages for annoyance, discomfort, emotional distress, mental anguish, and harm to Plaintiffs' person and property.

201.   In maintaining the nuisance, which is continuing, Facility Defendants and fictitiously named Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Facility Defendants and fictitiously named Defendants were done with malice, fraud and/or oppression as described herein. As such, Plaintiffs are entitled to exemplary damages.

## SIXTH CAUSE OF ACTION

## PUBLIC NUISANCE – PERMANENT

### (By Plaintiffs Against Facility Defendants)

202.   Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

203.   Plaintiffs own and/or occupy property at or near the exposed area.  At all relevant times, Plaintiffs had a right to occupy, enjoy, and/or use their property without interference by Facility Defendants.

204.   Facility Defendants by reason of their wrongful acts and/or omissions created a permanent condition that has affected and continues to affect a substantial number of people at the same time in the form of (a) a significant decrease in the value of the property, (b) exposure to an array of toxic substances, and/or (c) a lingering smell of noxious fumes permeating homes, schools, churches, retail and service business establishments in the area where people live and raise their families.

205.   The condition that Facility Defendants created and/or permitted to exist has affected and continues to affect a substantial number of people within the general public, including causing Plaintiffs personal injuries and disturbance in the enjoyment of everyday living.

206.   An ordinary person of reasonable sensibilities would reasonably be annoyed and/or disturbed by the condition created by each and every Facility Defendant.

207.   The seriousness of the harm outweighs the social utility of the conduct of any of the Facility Defendants.

208.   Plaintiffs did not consent to the conduct of Facility Defendants as described herein.

209.   As a direct and proximate result of the wrongful acts and/or omissions of Facility Defendants, Plaintiffs have suffered and continue to suffer harm that is different from the type of harm suffered by the general public.  Specifically, Plaintiffs have lost the occupancy, possession, use, and/or enjoyment of their land, real property, and/or personal property, including but not limited to, a reasonable and rational fear that the area is still dangerous, a diminution in the fair market value of their property, an impairment of the salability of their property, and/or exposure to an array of toxic substances on their property.  Further, Plaintiffs have experienced physical ailments, including but not limited to, nausea and vomiting, dizziness, headaches, and respiratory illnesses.  Plaintiffs are entitled to damages for all such past and present injuries.

210.   As a direct and proximate result of the wrongful acts and/or omissions of Facility Defendants, Plaintiffs suffered and continue to suffer damages as described above and, in an amount, according to proof at trial.

211.   The contamination described herein constitutes a nuisance within the meaning of Section 3479 of the California Civil Code.

212.   Plaintiffs are informed and believe, and on that basis allege, that the nuisance is permanent.

213.   To remedy the harm caused by Facility Defendants' nuisance Plaintiff will seek injunctive relief, including without limitation an order requiring Facility Defendants to: (1) create a fund for the cost of medical monitoring to monitor the health of Plaintiffs and diagnose at an early stage any ailments associated with exposure to toxic substances, including biosolids, produced and released as a result of the Fire; (2) repair and restore the areas impacted by the fire and resulting production and release of toxic gas in and around the area; (3) immediately cease operations and close down the Facility; and (4) prevent Facility Defendants from storing or processing biosolids on unpermitted sites in Hinkley and the surrounding area.

214.   Plaintiffs further seek compensatory damages for annoyance, discomfort, emotional distress, mental anguish, and harm to Plaintiffs' person and property.

215.   In maintaining the nuisance, which is continuing, Facility Defendants and fictitiously named Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Facility Defendants and fictitiously named Defendants were done with malice, fraud and/or oppression as described herein. As such, Plaintiffs are entitled to exemplary damages.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR COMPETITION LAW
## (CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.*)
### (By Plaintiffs Against All Defendants)

216.   Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

217.   Defendants, and each of them, have engaged in, and continue to engage in, unlawful, unfair and/or fraudulent business acts, omissions, and/or practices that constitute unfair competition within the meaning of Business & Professions Code § 17200, *et seq.* including but not limited to, the acts, omissions and/or practices alleged herein and further set forth below:

    a.   Accepting and composting materials not authorized by permit, in violation of Pub. Resources Code, § 44004;

    b.   Exceeding maximum permitted wet tons of collected materials, in violation of Pub. Resources Code, § 44022;

    c.   Allowing accumulation of feedstock piles, in violation of Pub. Resources Code, § 44004;

    d.   Failing to control odor, in violation of Cal. Code Regs., tit. 14, §17867(a)(2);

    e.   Failing to adhere to Odor Impact Minimization Plan, in violation of Cal. Code Regs., tit. 14, § 17863.4;

f.  Failure to provide fire prevention, protection, and control, in violation of Cal. Code Regs., tit. 14, § 17867(a)(9);

g.  Failing to keep records of all smolders and fires, in violation of Cal. Code Regs., tit. 14, § 17869(b);

h.  Creating a nuisance, in violation of Mojave Desert AQMD Rule 402;

i.  Burning combustible materials in an open outdoor fire, in violation of Mojave Desert AQMD Rule 444;

j.  Discharging visible emissions into the atmosphere Mojave Desert AQMD Rule 401;

k.  Failing to maintain and operate the Facility to minimize the possibility of fire, in violation of Cal. Code Regs., tit. 22, § 66264.31;

l.  Unlawful dumping of waste off-site, in violation of Cal. Penal Code § 374.3.

218.  Unless enjoined by order of the Court, Defendants will continue in the course of conduct alleged herein.

219.  Plaintiffs have no adequate remedy at law in that damages are insufficient to protect them and others similarly situated from the future danger and harm caused by the acts and practices by Defendants described in this Complaint.

220.  Unless injunctive relief is granted to enjoin the future unlawful business practices of the Defendants, Plaintiffs will suffer irreparable injury and damage.

221.  Defendants, and each of them, must be immediately and permanently enjoined, pursuant to Business and Professions Code § 17203, from engaging in acts or practices that, as alleged in this Complaint, violate the aforementioned laws and regulations, and are otherwise unlawful, unfair and/or fraudulent.

/ / /

/ / /

/ / /

/ / /

# EIGHTH CAUSE OF ACTION

## TRESPASS

### (By Plaintiffs Against Facility Defendants)

222.   Plaintiffs incorporate and re-allege each of the paragraphs above as though fully set forth herein.

223.   Plaintiffs own and/or occupy property at or near the exposed area.

224.   At all relevant times, Plaintiffs had a right to occupy, enjoy, and/or use their property without interference by Facility Defendants.

225.   Facility Defendants caused a trespass by emitting biosolids and other chemicals (including particulate matter and/or chemicals with gaseous, non-gaseous, aquatic, and other properties) beyond the boundary of the Facility and Dump Sites in such a manner that it was reasonably foreseeable that the pollutants would, in due course, invade Plaintiffs' real property and cause physical injury or damage to that property, and in fact those chemicals did invade and deposit themselves on Plaintiffs' property in different locations, according to proof.

226.   Defendants negligently and/or intentionally allowed: (1) dangerous and/or hazardous conditions at the Facility and Dump Sites; (2) fire(s), unauthorized fire(s) and/or uncontrolled fire(s) to ignite and burn at the Facility; (3) the Facility and/or Dump Sites to emanate offensive matters including but not limited to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, and chemicals, among other things; (4) the Facility and/or Dump Sites to interfere with Plaintiffs' use and enjoyment of their properties; and (5) otherwise allowed the Facility and/or Dump Sites to cause harm to Plaintiffs.

227.   Facility Defendants caused a trespass by negligently maintaining the Facility and/or Dump Sites and the compost contained therein in such a way that it was reasonably foreseeable that combustion and fire would occur, causing smoke, fumes, and soot to enter Plaintiffs' neighboring properties.  The consumption by fire of both biosolids and plastic products caused debris and chemicals (including particulate matter

and/or chemicals with gaseous, non-gaseous, aquatic, and other properties) to leave the Facility property in such a manner that it was reasonably foreseeable that the contaminants would, in due course, invade Plaintiffs' real property and cause physical injury or damage to that property.

228.   As alleged herein, Defendants negligently and/or intentionally deposited smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate

matter, and chemicals upon the properties of Plaintiffs, and by so doing, entered their properties. This was a substantial factor that resulted in Plaintiffs' harm.

229.   Plaintiffs did not grant permission for Defendants to cause the smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, and/or chemicals to enter their properties in the manner it did; and/or Defendants exceeded any permission.

230.   Defendants' entry onto Plaintiffs' property was unauthorized and tangible, and interfered with Plaintiffs' exclusive possessory rights and otherwise caused them harm as further alleged herein.

231.   The exposure depositing chemicals onto Plaintiffs' property entered, invaded, and intruded the real property of Plaintiffs, and caused harm to Plaintiffs' property and Plaintiffs personally without Plaintiffs' privilege, permission, consent, authorization, invitation, or justification.

232.   Facility Defendants had a duty to use reasonable care not to enter, invade, or intrude on the real property of Plaintiffs.  Defendants also owed a duty to Plaintiffs to exercise reasonable care in the maintenance and operation of the Facility because of the proximity to the neighboring communities.

233.   Facility Defendants breached the duty they owed to Plaintiffs when they failed to exercise reasonable care in the maintenance and operation of the Facility, as described herein, which conduct resulted in entry, intrusion, or invasion of Plaintiffs' properties.

234.   Facility Defendants knew or should have known that their conduct and the ongoing operation and maintenance of the Facility would foreseeably result in causing damage to the real properties and economic interests of persons in the area affected by the exposure.

235.   As a direct and proximate result of Facility Defendants' trespass, Plaintiffs have suffered and continue to suffer damages, losses, and injuries described above in amounts according to proof at trial.

## NINTH CAUSE OF ACTION
## WRONGFUL DEATH

**(By Plaintiffs Shan Mulligan, individually and as Administrator of the Estate of Laura Manzo, and Lucille Riddle Against All Defendants)**

236.   Plaintiffs incorporate each and every allegation above as though fully set forth herein.

237.   As a direct and legal result of Defendants' actions and/or omissions, and/or each of them, people died from the Fire, Defendants' release of smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter, toxins, contaminants and/or chemicals into the area surrounding the facility, and/or Decedents' exposure to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals from the Facility and/or the Dump Sites.

238.   As a direct and proximate result of Defendants' conduct alleged herein, including but not limited to, Defendants' actions and/or omissions, the Decedents suffered physical impacts and injury which caused or contributed to their deaths.

239.   As a direct and proximate result of Defendants' actions and/or omissions, Plaintiffs suffered and continue to suffer the loss of society, companionship, comfort, consortium, love, solace, care, assistance, affection, moral support, protection, care, attention, advice, or counsel, loss of care attention, advice, or counsel of a reciprocal beneficiary, loss of filial case or attention, or loss of parental care, training, guidance, or education from Decedents as a result of the Decedents' death, and other harms permitted

1  under California law, in an amount to be determined at trial.

2       240.   As a further direct and legal result of Defendants' actions and/or omissions,

3  and/or each of them, Plaintiffs incurred funeral and/or burial expenses and/or related

4  medical expenses in an amount according to proof at trial.

5       241.  Among other things, Plaintiffs seek all damages recoverable under

6  California law, including but not limited to the net pecuniary loss to the estate of

7  Decedent(s).

8       242.   As a further direct and legal result of Defendants' actions and/or omissions,

9  and/or each of them, Plaintiffs suffered economic losses, including but not limited to the

10  loss of financial support, and/or the loss of household services in an amount according

11  to proof of trial.

12       243.   Accordingly, pursuant to California Code of Civil Procedure 377.60 *et seq*.,

13  Plaintiffs seek all damages recoverable under the laws of the State of California against

14  Facility Defendants as set forth in the Prayer for Relief contained below, and in an

15  amount according to proof at trial.

16                    **TENTH CAUSE OF ACTION**

17                        **SURVIVAL ACTION**

18  **(Plaintiffs Shan Mulligan, individually and as Administrator of the Estate of**

19          **Laura Manzo, and Lucille Riddle, Against All Defendants)**

20       244.   Plaintiffs incorporate each and every allegation above as though fully set

21  forth herein.

22       245.   As a direct and proximate result of Defendants' conduct alleged herein,

23  Decedents perished as a result of: (1) the effects of the Fire; (2) the Defendants' release

24  of smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter,

25  toxins, contaminants and/or chemicals into the area surrounding the facility; and/or (3)

26  Decedents' exposure to smoke, noxious or offensive gases, odors, pollutants, toxins,

27  physical or particulate matter, contaminants and/or chemicals from the Facility and/or

28  the Dump Sites.

246. Prior to their deaths the Decedents suffered damages including costs for medical care, lost, damaged, or destroyed property, and pre-death impact or injury as well as attendant pain and suffering.

247. Prior to Decedents' deaths, this cause of action arose in their favor. Since Decedents' death, Plaintiffs have served as representatives for Decedents' estates and/or are authorized, as successor in interest, to pursue any and all legal claims for damages relevant to the property that was damaged, lost and/or destroyed, and/or to recover damages for expenses incurred related to medical and/or emergency services, and/or to recover all other recoverable damages.

248. Had Decedents survived, they would be entitled to bring an action against Defendants, and each of them, to recover all damages accrued as a result of Facility Defendants' wrongful conduct.

249. As set forth above, the Fire, the release of smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter, toxins, contaminants and/or chemicals into the area surrounding the Facility and Dump Sites, and Decedents' exposure to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals from the Facility and/or the Dump Sites was a direct and legal result of the negligence, carelessness, recklessness, unlawfulness and conduct of Defendants, and/or each of them.

250. As a direct and legal result of Defendants' actions and/or omissions, and/or each of them, immediately prior to Decedents' death, Decedents suffered personal injuries, great pain and suffering, and/or damage to their real and/or personal property. Had they survived, Decedents would have been entitled to recover all such damages allowed under California law under the causes of action alleged above. Plaintiffs therefore seek all recoverable damages available under California law, including but not limited to all those incurred prior to death.

251. As a further direct and legal result of Defendants' actions and/or omissions and/or each of them, expenses were incurred for the identification and/or removal of

Decedents' remains and other medical and/or emergency services related to the Fire, the release of smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter, toxins, contaminants and/or chemicals into the area surrounding the Facility and Dump Sites, and Decedents' exposure to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals from the Facility and/or the Dump Sites.

252.   Pursuant to Code of Civil Procedure 377.30 *et seq*., Plaintiffs brings this action against Defendants, and each of them, to recover all damages recoverable under the causes of action and claims not extinguished by any Decedent's death, including any and all claims for punitive or exemplary damages against Defendants as permitted under the laws of the State of California.

253.   As a further direct and legal result of the wrongful acts and/or omissions of the Facility Defendants, and/or each of them, Plaintiffs seek the recovery of punitive and exemplary damages against Defendants as set forth above.  Defendants and/or each of them, acted willfully, wantonly, with oppression, fraud, malice and/or with a knowing, conscious disregard for the rights and/or safety of others, such that the Plaintiffs request the trier of fact, in the exercise of sound discretion, award Plaintiffs additional damages pursuant to Code of Civil Procedure § 3294 for the sake of example and sufficient to punish the Defendants, and/or each of them, for their despicable conduct, in an amount according to proof.

254.   Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of California against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

## ELEVENTH CAUSE OF ACTION
## LOSS OF CONSORTIUM
### (By Plaintiff Shan Mulligan Against All Defendants)

255.   Plaintiffs incorporate each and every allegation above as though fully set forth herein.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

256.   As a direct, legal, and proximate result of the culpability and fault of Defendants, be such fault through any of the claims contained herein, Plaintiffs suffered and continue to suffer the loss of support, service, love, companionship, affection, society, intimate relations, and other elements of consortium, all to their general damage in an amount in excess of the jurisdictional minimum of this Court.

257.   As alleged above, Defendants knew and had reason to know that their actions and/or omissions caused increased risk of harm to Plaintiffs and to their spouses and/or domestic partners and/or loved ones and/or family members and/or grandchildren and/or children.

258.   Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated their Facility and Dump Sites, including the risk of starting a fire, the release of smoke, noxious or offensive gases, odors, pollutants, physical or particulate matter, toxins, contaminants and/or chemicals into the area surrounding the facility; and/or the risk from exposure to smoke, noxious or offensive gases, odors, pollutants, toxins, physical or particulate matter, contaminants and/or chemicals from the Facility and/or the Dump Sites.

259.   Defendants' conduct, as alleged above, was oppressive, malicious, and wanton, subjected Plaintiffs and others like them to cruel and unjust hardship, and constitutes a willful, conscious, and wanton disregard for the rights and safety of others. Such conduct warrants imposition of punitive damages.

260.   Based on the foregoing, Defendants, and/or each of them, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such the Plaintiffs request that the trier of fact, in the exercise of sound discretion, award Plaintiffs additional damages for the sake of example and sufficient to punish the Defendants, and/or each of them, for their despicable conduct and to deter Defendants and others from engaging in similar conduct in the future.

## VIII.  <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs request relief against Defendants as follows:

    i.   a judgment in favor of Plaintiffs on all claims;

    ii.   for compensatory and general damages according to proof;

    iii.   an award to Plaintiffs for the amount of damages, including personal injuries, property damage, damage to the health of their pets, medical monitoring, and diminution in property value, according to proof;

    iv.   loss of the use, benefit, and quiet enjoyment of Plaintiffs' real and/or personal property;

    v.   past and future medical expenses and incidental expenses according to proof, including but not limited to medical monitoring;

    vi.   loss of wages, earning capacity, and/or business profits or proceeds and/or any related displacement expenses, according to proof;

    vii.   an immediate temporary injunction against Defendants to provide the following: (1) a fund for the relocation of Plaintiffs and impacted residents; (2) abate the nuisance; (3) immediately cease operations and close down the Facility; or, in the alternative, (4) repair and restore areas impacted by the release of toxic materials in and around the Facility; (5) prevent Defendants from operating the Facility without adequate safety precautions and ongoing monitoring to ensure no future risk of toxic fugitive emissions occurs; and (6) prevent Defendants from storing or processing biosolids on unpermitted sites in Hinkley and the surrounding area.

    viii.   a permanent injunction against Defendants to provide the following: (1) a fund for the relocation of Plaintiffs and impacted residents; (2) abate the nuisance; (3) immediately cease operations and close down the Facility; or, in the alternative, (4) repair and restore areas impacted by the release of toxic materials in and around the Facility;

(5) prevent Defendants from operating the Facility without adequate safety precautions and ongoing monitoring to ensure no future risk of toxic fugitive emissions occurs; and (6) prevent Facility Defendants from storing or processing biosolids on unpermitted sites in Hinkley and the surrounding area.

ix.   general damages for fear, worry, annoyance, discomfort, disturbance, inconvenience, mental anguish, emotional distress, and loss of quiet enjoyment of property;

x.   an award to Plaintiffs for punitive and exemplary damages according to proof;

xi.   all costs of suit, including attorneys' fees where appropriate, appraisal fees, engineering fees and related costs;

xii.   for reasonable attorneys' fees pursuant to California Code of Civil Procedure, section 1021.5;

xiii.   for pre- and post-judgment interest at the legal rate on all amounts awarded;

xiv.   All compensable damages for wrongful death, survival damages and loss of consortium as permitted under the laws of the State of California;

xv.   loss of consortium, loss of love, society, solace, companionship, comfort, care, assistance, relations, training, guidance, protection, affection, and/or moral support from Decedents in an amount according to proof,

xvi.   funeral and/or burial expenses and/or related medical expenses and/or removal of Decedents' remains and other medical and/or emergency services related to their injury and death in an amount according to proof;

      xvii.   economic losses, including but not limited to the loss of financial support, gifts, benefits, and/or the loss of household services in an amount according to proof of trial;

     xviii.   losses and damages that the Decedents sustained before death, including all pre-death pain and suffering, emotional distress, and all other penalties or punitive or exemplary damages that the Decedents would have been entitled to recover had they lived;

      xix.   all costs of suit, including reasonable attorneys' fees, and all other costs and fees, arising from the prosecution of this action as permitted under the laws of the State of California; and

       xx.   for all other relief as this Court may deem just and proper.

## IX.   JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all of the triable issues within this Complaint.

Dated: December 8, 2023         **COTCHETT, PITRE & McCARTHY, LLP**

By:   _/s/ Hannah K. Brown_
          GARY A. PRAGLIN
          KELLY W. WEIL
          HANNAH K. BROWN
          *Attorneys for Plaintiffs*

Dated: December 8, 2023         **SCHACK LAW GROUP**

By:   _/s/ Natasha N. Serino_
          ALEXANDER M. SCHACK
          NATASHA N. SERINO
          SHANNON F. NOCON
          *Attorneys for Plaintiffs*

///
///
///

1 | Dated: December 8, 2023 **LAW OFFICES OF GREGORY J. HOUT**

2

3 By: __/s/ Gregory J. Hout_____

4 GREGORY J. HOUT
*Attorney for Plaintiffs*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1. Detrick Lashawn Adams
2. James Edward Adams Jr.
3. Patricia  Adams
4. Emily Guadalupe Aguilar
5. Juan Jesus Aguilar
6. Sonja  Aguilar
7. Corey Allen Aldridge
8. Bradley  Allen
9. Reef Charlotte Allen
10. Lloyd Charles Alvarez
11. Crystal  Anderson , individually and as guardian ad litem for Angelina Anderson, Aaliyah Anderson, Lillianna Anderson, Dillinger Anderson, and Reyes Anderson
12. Bryant  Anderson
13. Carol Jean Archey
14. Charlotte  Armstrong
15. Constance Faith Aviles
16. Daniel  Aviles
17. Diego  Aviles
18. Ezra Isaac Aviles
19. Kaytlynn Brane Aviles
20. Marcelino Paul Aviles
21. Vincent Miguel Aviles
22. Aliyah  Baca
23. Theodore  Badmi
24. Cornelius  Bailey
25. Lauren Michelle Bains
26. Shazada Naunihal Singh Bains

27.   Brenda Lynn Banks

28.   Claudia Lynn Banks

29.   Daron Shane Banks

30.   George Robert Banks

31.   Audriana Berlynn Barnes , a minor by and through her Guardian Ad Litem, Christine Holmeyer

32.   Kelly Michael Barnes

33.   Vanessa  Barnes

34.   Joanna A. Barries

35.   Heather  Barro , individually and as guardian ad litem for Brooklyn Hyde and Ashley Hyde

36.   Joseph  Barro

37.   Annica Jayann Beardshear

38.   Donald Wayne Beardshear

39.   Melissa  Beattie

40.   Luna  Benavidez

41.   Sebastian  Benavidez

42.   Kelly  Blackwell

43.   Jonathan  Blake , individually and as guardian ad litem for Rosa Blake, Jeremy Blake, and Stephen Blake

44.   Joseph  Blake

45.   Nicolette  Blake , individually and as guardian ad litem for Farrah Spraggins, Isaiah Spraggins, and Naomi Ceballos

46.   Rebekah  Blake

47.   Catherine A. Blevins

48.   Loretta Annette Blevins

49.   Michele  Blundell

/ / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

50.     Catherine  Bogart , individually and as guardian ad litem for Ashley Bogart, Abigail Bogart, and Christopher Bogart

51.     Nicholas  Bogart

52.     Brandy  Bohaty

53.     Cherish  Bohaty

54.     Ethan  Bohaty

55.     Jacob  Bordier

56.     Cody  Boswell

57.     Claude Stuart Brackeen

58.     Ben  Brady

59.     Eric  Brand

60.     Mishelle  Brand

61.     Nathan  Brand

62.     Patricia  Brand

63.     Rodney A. Brand Sr.

64.     Teresa Anne Brand

65.     Don Lee Brown

66.     Lynette  Brown

67.     Patricia Ann Brown

68.     Shawn  Brown

69.     Erica  Brummett , individually and as guardian ad litem for John Ford, Daniel Ford, and Christopher Allen

70.     Barbara  Bryson

71.     Kimberly  Buchanan

72.     Dedra  Burgess , individually and as guardian ad litem for Neveah Burgess

73.     Eunice Erna Burks

74.     Beretta Zetta Burns

75.     Elizabeth Ann Burns



LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

76. Gladys Morine Burns

77. Helena Norine Burns

78. Keeth Bennett Burns

79. Stephanie N. Burns

80. Melodee  Buroff

81. Steven  Buroff

82. Barbara  Bustamante , individually and as guardian ad litem for Zsofia
Bustamente

83. Jozsef  Bustamante

84. Leo  Bustamante

85. Niklos  Bustamante

86. Zsofia  Bustamante , a minor by and through her Guardian Ad Litem, Barbara
Bustamante

87. Mercedes  Butler , individually and as guardian ad litem for Aria Evans, Xavier
Evans, and Zander Evans

88. Kimberly Michelle Candelas

89. Leonard  Caples

90. Saundra  Caples

91. Imani  Carr-Damu

92. Alice M. Carrigan

93. Theresa  Carter

94. Margarita Lucina Castaneda , individually and as guardian ad litem for Claire
Della Orcino

95. Linda  Castongia , individually and as guardian ad litem for Axle White, and Mile
White

96. Leah  Cazarez

97. Guadalupe  Ceja

98. Isabell  Ceja

99.    Jose  Ceja Jr., individually and as guardian ad litem for Jose Ceja III

100.   Judy  Ceja

101.   Jorge  Cervantes

102.   Anthony  Chambliss

103.   Amber  Chavez , individually and as guardian ad litem for Anastasia Chavez-Williamson

104.   Elizabeth  Chavez

105.   Eugene (Gene)  Chavira

106.   Jaelynn Maria Chavira , a minor by and through her Guardian Ad Litem, Mark Chavira

107.   Karen  Chavira , individually and as guardian ad litem for Audrea Chavira

108.   Loretta Eliana Chavira , a minor by and through her Guardian Ad Litem, Mark Chavira

109.   Mark Anthony Chavira Jr., individually and as guardian ad litem for Jaelynn Maria Chavira and Loretta Eliana Chavira

110.   Audrea  Chavira , a minor by and through her Guardian Ad Litem, Karen Chavira

111.   Richard Martin Chavira Sr.

112.   Richard Martin Chavira Jr.

113.   Roberta  Chavira-Walker

114.   Daniel  Chuy

115.   Chad  Clark

116.   Jessica  Clark , AKA Jessica Clark Carmona, individually and as guardian ad litem for Alice Larssen-Clark, Anthony McKinney, Brett McKinney, and Penelope McKinney

117.   Pamela  Clark

118.   Samantha  Coffee

119.   Leonard F. Contreras

120.   Michael  Contreras

121. Sonia Leslie Contreras

122. Virginia M. Contreras

123. Jamie  Copeland

124. Anthony Joseph Cordova

125. Kenneth Azul Cordova

126. Lucille  Cordova

127. Marceline Ivy Cordova

128. Raul  Coronado Cancino

129. Jose  Coronado Meza

130. Tina  Cortez

131. Jennifer  Dalhover Silva

132. Karen Kay Daniels

133. Samuel Lee Daniels

134. Sheila  Davidson

135. Adam  Davila

136. Veronica  Davila

137. Shawn  Davis

138. Debbie  Dazzi , individually and as guardian ad litem for Brent Delaney Trexler

139. Gilbert  Deaton

140. Jack  Deaton Jr.

141. Terry  Deaton

142. Shelly  Deckard , individually and as guardian ad litem for Abigail Deckard, and Madilyn Deckard

143. Amaya  DeJager , a minor by and through her Guardian Ad Litem, Ruby Ann Umali

144. Jae-Ann  DeJager

145. Jason  DeJager

146. Jackie  Del Trujillo

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

147. Nila Delaney

148. Justine Dellavecchia

149. Karen Delzell- Hare , individually and as guardian ad litem for Zelda Hare, and Luke Hare

150. Michelle L. Dempsey

151. Angela Densmore , AKA Angela Carter, individually and as guardian ad litem for Noah Norton, Brantley Densmore, Connor Densmore, and Alexander Densmore

152. Travis Densmore

153. Desire Dewey

154. Herbert Dingman

155. Brianne Divine , individually and as guardian ad litem for Ronnie Lehman Jr., and Ryder Lehman

156. Amber Christine Dodd

157. Mercedes Dominguez

158. David H. Donaghe

159. Marlana Donaldson

160. Aria Downing

161. Cindy Sue Downing

162. Emma Jane Doyle , a minor by and through her Guardian Ad Litem, Kathleen Eaton

163. Michael Arthur Doyle

164. Miliana Dube

165. Samantha Dunton , individually and as guardian ad litem forAmiyah Rice, Jazlynn Rice, Jeremiah Rice, and Zaryiah Rice

166. Zachery Dunton

167. Olivia Duran

168. Paul Duran

169.  Kathleen Jeanette Eaton , individually and as guardian ad litem for Emma Jane Doyle

170.  Corra Lee Eichenberger

171.  Teresa Mae Eichenberger

172.  Emmett Russell Elkins , a minor by and through her Guardian Ad Litem, Jenae Elkins

173.  Grace Jenae Elkins , a minor by and through her Guardian Ad Litem, Jenae Elkins

174.  Jenae  Elkins , individually and as guardian ad litem for Emmett Russell Elkins, Grace Jenae Elkins, and Timothy Grant Elkins

175.  Timothy Grant Elkins , a minor by and through her Guardian Ad Litem, Jenae Elkins

176.  Wendy  Esquivel , individually and as guardian ad litem for Jose Esquivel, Oscar Alejandro Esquivel, Mathias Ezekial Esquivel, and Arianah Guadalupe Esquivel

177.  April  Evans

178.  Mariah  Evans

179.  Patricia  Evans A.

180.  Zack  Evans

181.  Todd  Faber

182.  Destinii  Farago

183.  Andrea  Figueroa M.

184.  Michael Andrew Fletcher

185.  Amanda  Flores , individually and as guardian ad litem for Adriana Flores, Eleanor Flores, Marceline Flores, and Mark Flores Jr.

186.  Angel V Flores

187.  Gary V Flores

188.  Isreal  Flores

189.  Janell Shannon Flores

190.  Jose Varela Flores

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

191. Maritza  Flores

192. Patricia  Flores

193. Patrick Adam Flores

194. Paul P. Flores

195. Shirley Ann Flores

196. Trisha Acenita Flores

197. Zachariah Angel Brent Flores

198. Hilario  Flores , individually and as guardian ad litem for Saraih Flores

199. America  Flores Jimenez , individually and as guardian ad litem for Miguel Bojorquez, Alan Jimenez Rodriguez, and Rosalinda Jimenez Flores

200. Crystal  Flores-Kane

201. Ashley Katrina Flores-Radtke

202. Faith  Fonner

203. Wendy  Foor

204. Samantha  Forbito

205. Alicia  Fox , individually and as guardian ad litem for Cassie Callaway, and Kaylee Callaway

206. Deborah  Fox

207. Sharon  Fox

208. Mark Kendal Franey

209. Ian  Frazier

210. Alden Fael Frederick , a minor by and through her Guardian Ad Litem, Nicole Allison Federick

211. Gaia Lux Frederick , a minor by and through her Guardian Ad Litem, Nicole Allison Federick

212. Nicole Alison Frederick , individually and as guardian ad litem for Alden Fael Frederick and Gaia Lux Frederick

213. Shane William Frederick



214.  Cole R. Fritz , a minor by and through her Guardian Ad Litem, Lisa Fritz

215.  David R. Fritz

216.  Jemma A. Fritz , a minor by and through her Guardian Ad Litem, Lisa Fritz

217.  Lisa Romero Fritz , individually and as guardian ad litem for Cole R. Fritz and Jemma A. Fritz

218.  Ronald  Fry

219.  Trina  Fry , individually and as guardian ad litem for Kayden Fry, and Landon Fry

220.  Deanna  Fuller

221.  Charles  Gallegos

222.  Ruth  Gallegos

223.  Ana  Garcia

224.  Esequiel  Garcia

225.  Maria  Garcia

226.  Ramiro Thomas Garcia

227.  Raymon  Garcia

228.  Yolanda  Garcia

229.  Araceli Nancy Garcia Mendoza

230.  Guadualupe  Garcia Mendoza

231.  Ramiro  Garcia Mendoza

232.  Christopher  Gardner

233.  Autum  Garvey

234.  Martin  Garza

235.  Anthony  Generette

236.  Antonio  Generette

237.  Stephanie  Generette

238.  Jeff  Gerhart

239.  Logan  Gewirtz , a minor by and through her Guardian Ad Litem, Whitney Nason

240.  Louis  Gewirtz

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

241. Louis Jr. Gewirtz , a minor by and through her Guardian Ad Litem, Whitney Nason

242. Randy  Gilworth

243. Mellennie  Gonzalez , individually and as guardian ad litem for Issac Valencia, Josiah Valencia, and Olyver Gonzalez

244. Sergio  Gort

245. Tara  Gort , individually and as guardian ad litem for Levi Gort, Madisyn Gort, Kian Gort, Preston Gort, and Mya Gort

246. David  Griego

247. Millie  Grill

248. Nicholas  Grill

249. Adrian Gabriel Guerrero

250. Joseph  Guerrero

251. Stephanie John Guerrero

252. Peighton R. Guy

253. Marlene  Guy Donaghe

254. Margaret  Hall

255. Cameo  Hallmark

256. Tifini  Hallmark

257. Norman  Halstead

258. Thomas  Hare

259. Alma  Haro

260. Miguel  Haro

261. Urivan  Haro

262. Victoria Payne Harper

263. Delfina  Harrell

264. Belinda J. Harris

265. Mandolyn  Hart

266. Mandy  Hart-Beardshear

267. Galen  Hartman

268. Dennis Robert Hemingway

269. Kathleen Jean Hemingway

270. Amber  Henderson , individually and as guardian ad litem for Alyssa Baca

271. Jacqueline  Henderson

272. Alexandra  Hendley

273. Linda Madge Hensley

274. Paul Edward Hensley

275. Anjelica  Hernandez

276. Cristobal  Hernandez

277. Daniel  Hernandez Jr.

278. Daniel  Hernandez Sr.

279. Elise  Hernandez

280. Esperanza  Hernandez

281. Marilyn Yvette Hernandez

282. Mateo  Hernandez

283. Sofia Bella Hernandez

284. Anaya  Herrera

285. Janice Lee Herrick

286. Courtney Ann Lewis Hewitt

287. Geoffrey Lloyd Hewitt

288. Avery  Hilarides , a minor by and through her Guardian Ad Litem, Tiffany Hilarides

289. Frank  Hilarides

290. Jax  Hilarides , a minor by and through her Guardian Ad Litem, Tiffany Hilarides

291. Tiffany  Hilarides , individually and as guardian ad litem for Avery Hilarides, Jax Hilarides, and Xander Spargur

292.   James  Hood

293.   Brianna  Hoody

294.   Brooklyn  Hoody

295.   Isaiah  Howard

296.   Tabitha  Howard

297.   Michael  Hughes

298.   Mirinda  Hughes , individually and as guardian ad litem for Carson Hughes, and Adyson Hughes

299.   Korbin  Hunt

300.   Madison  Hyde

301.   Brandi Chari Iden

302.   Edward Ernest Iden Jr.

303.   Dorothy Ann Jackson

304.   Erica  Jackson

305.   Johnny  Jackson

306.   Clinton  James

307.   Abelardo  Jaramillo Jr., individually and as guardian ad litem for Avalyn Jaramillo and Braxton Jaramillo

308.   Avalyn  Jaramillo , a minor by and through her Guardian Ad Litem, Abelardo Jr. Jaramillo

309.   Braxton  Jaramillo , a minor by and through her Guardian Ad Litem, Abelardo Jr. Jaramillo

310.   Hannah  Jarnagin

311.   Revis  Jarnagin Sr.

312.   Susan  Jarozewski

313.   Amelia  Jarvis , a minor by and through her Guardian Ad Litem, Vanessa Jarvis

314.   Joel  Jarvis , a minor by and through her Guardian Ad Litem, Vanessa Jarvis

315.   Joseph  Jarvis , a minor by and through her Guardian Ad Litem, Vanessa Jarvis

316. Robert  Jarvis

317. Vanessa M. Jarvis , individually and as guardian ad litem for Amelia Jarvis, Joel Jarvis, and Joseph Jarvis

318. Kelly L. Jeffrey

319. Alize  Jenkins

320. Americo  Jimenez

321. Axel Ruvalcaba Jimenez

322. Leonel  Jimenez

323. Lidia  Jimenez

324. Rosa  Jimenez , individually and as guardian ad litem for Josiah Jimenez, Joseph Americo Jimenez Jr., Ruby Jimenez, and Joel Jimenez

325. Xicotencalt  Jimenez

326. Brandon  Johnson

327. Geneva  Johnson

328. Mary  Johnson , individually and as guardian ad litem for Richard Nelson

329. Mason  Johnson

330. Chad Christopher Jones

331. Cynthia M. Jones-Howard

332. Edward  Jordan

333. Madisyn  Kane

334. Allen Scott Kane Jr.

335. Victor Pattison Keaton

336. Aniko  Kegyulics

337. Frederick  Kegyulics

338. Walter  Kegyulics

339. Kgosi Thabang Kesiilwe

340. David Troy Korner

341. Jesse Herbert Lloyd Korner

342. Robert  Kurth

343. Robert Lee Kurth

344. Jessie  Lara

345. Juanita  Lara

346. Macario  Lara

347. Victoria  Lara

348. Brent  Lautzenheiser

349. Janelle  Lazos

350. Ronnie  Lehman

351. David  Leimbach

352. Mandi  Leimbach , AKA Mandi Alvarado

353. Wayne  Lewis

354. Tammy  Light

355. William  Light

356. Mark Anthony Lizarraga

357. Thomas  Long

358. Anthony  Lopez

359. Louisa  Lopez

360. Robert  Lopez

361. Sobeida  Lopez Flores , individually and as guardian ad litem for Ed Sunel Haro, and Jay Lule

362. Tina  Loustaunau

363. Amanda  Lowe

364. Peggie  Loyd

365. Breanna  Lucero

366. Jennifer  Lucero

367. Kylee  Lucero

368. Lawrence  Lucero

369. Brayan  Luna

370. Janet  Luna , individually and as guardian ad litem for Jollene Cervantes, and Violet Cervantes

371. Julie  Luna

372. Leonel  Luna

373. Manuel  Luna

374. Manuel  Luna Jr., individually and as guardian ad litem for Rey Luna

375. Saleta A. Luna-Bordier

376. Misty  Luse , individually and as guardian ad litem for Aura Salecido, and Ava Salecido

377. Robert  Luse

378. Sean E. MacDonald

379. Monica  Madrid , individually and as guardian ad litem for Alison Sturnacle, Steven Jack Sturnacle, and Mila Fay Sturnacle

380. Jose Enrique Magana

381. Maria Utimia Marquez

382. James  Martin Jr.

383. Loveta  Martin , individually and as guardian ad litem for Serenity Powers

384. Sandra  Martin

385. Alexis  Martinez

386. Erik  Martinez , individually and as guardian ad litem for Erik Martinez Jr., Essence Martinez, and Precious Martinez

387. Ines  Martinez

388. Martin  Martinez

389. Sylvia  Martinez

390. Dariana  Martinez Garcia

391. Mario  Mata

392. Brant  McGinnis

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

393. Tammi  McGinnis

394. Dominic Xavier McLing

395. Tasheena  McSwain , individually and as guardian ad litem for Micha McSwain,
Mayjor Samuel, and Malaki Samuel

396. Tamara L.A. Meinzer - Dingman

397. Dylan  Merchant

398. Angelina  Mesa

399. Lorraine  Mesa

400. Trudi  Miller

401. Florine Charlotte Miller-Wetterman

402. Dennis  Mitchell Jr., individually and as guardian ad litem for Eily Mea Mitchell

403. Eily Mea Mitchell , a minor by and through her Guardian Ad Litem, Dennis Jr.
Mitchell

404. Daniel  Mondragon

405. Allen  Monk

406. Fredrick  Monk

407. Richard  Monk

408. Rena Marie Montano

409. Robert Silva Montano

410. Alice Ricker Montecino

411. Lynn  Morris

412. Marlon  Morris

413. Cynthia G. Morrow

414. Kevin  Morrow

415. Steven  Morton , individually and as guardian ad litem for London Morton

416. Shan  Mulligan , individually, and as husband and administrator of the Estate of
Laura Manzo

417. Tammy  Nabours

418. Tammy  Nason

419. Whitney Ann Nason , individually and as guardian ad litem for Logan Gewirtz and Louis Jr. Gewirtz

420. Daniela  Natale

421. John  Natale

422. Mohammad Ibrahim Nazeeri

423. Denise R. Neish

424. Angelina Umali Nelkin

425. Dolores  Nelson

426. Jacqueline Ann Nelson

427. LeRoy Frederick Nelson

428. Richard  Nelson , a minor by and through her Guardian Ad Litem, Mary Johnson

429. Veronica Jo Nelson

430. Benjamin Eric Newton

431. Michael  Nolan

432. Mia Lynn Norris , a minor by and through her Guardian Ad Litem, Alex Breann Raster

433. Willow Elena Mae Norris , a minor by and through her Guardian Ad Litem, Alex Breann Raster

434. Sharon  Norton

435. Alejandro  Olivarez

436. Anthony Mio Orcino

437. Della Claire Orcino , a minor by and through her Guardian Ad Litem, Margarita Lucina Castaneda

438. Ramona  Ortez

439. Velsy  Ortiz

440. Nathan  Ortiz Enriquez

441. Robin  Overtion

442. Carlos  Ozuna

443. Helen  Ozuna

444. Diane  Pacheco

445. Rocio  Paez

446. Aeries Julian Perez

447. Claudia  Perez

448. Paul  Perez

449. Rio  Perez

450. Rudy Jose Perez Jr.

451. Jacqueline  Perry , individually and as guardian ad litem for Abriana Smith, and Zander Plotkin

452. Melissa Faye Perry

453. Lynnzey  Peterson

454. Nathan  Peterson

455. Barbara A. Pitts

456. Loren  Pitts

457. Tabitha Ann Pitts

458. Mario  Plascencia

459. Mario  Plascencia

460. Phillip  Plotkin

461. Daniel Wayne Powell

462. Rhonda Kay Powell

463. Richard Wayne Powell

464. Sherril Jean Powell

465. Bryan Douglas  Powers

466. Keith  Powers

467. Tiffany  Powers , individually and as guardian ad litem for Jesse Waterhouse, Olivia Waterhouse, Zachary Powers, and Reese Powers

468. Charles  Press

469. Lena Irene Purcell

470. Paulette  Purdy

471. Thomas  Purdy

472. Sandra  Quinton

473. David Leo Radtke

474. Delanie Margaret Radtke

475. Luca Matthew Radtke

476. Oscar H. Raedel

477. Ronda  Rainwater

478. Abel  Ramirez

479. Angela  Ramirez , individually and as guardian ad litem for Isabelle Ramirez, Zoey Ramirez, Avianna Ramirez, and Sebastian Ramirez

480. Corey  Ramirez

481. Ruben  Ramirez

482. Seferina  Ramirez

483. Victor  Ramirez Galvan

484. Alex Breann Raster , individually and as guardian ad litem for Mia Lynn Norris and Willow Elena Mae Norris

485. Barbara Katherine Ray

486. Pamela  Reeck

487. Georgina  Reynoso

488. Akil Thabiti Richmond

489. Lucille  Riddle , individually and as trustee of The Riddle Family Trust Dated March 30, 1997

490. Linda Faye Rigby

491. Amanda  Rivera , individually and as guardian ad litem for Lillyanna Rivera, Julianna Soler, and Edward Soler

492. Arnold Steven Roberts

493. Precious  Rodrigo

494. Robert Richard  Rodrigo III

495. Abdon G. Rodriguez Jr.

496. Abdon E. Rodriguez

497. Brenda Lynne Rodriguez

498. Magdalena  Rodriguez

499. Mariah G. Rodriguez

500. Marisol Loriana Rodriguez

501. Santiago Israel Rodriguez

502. Jesse  Rodriguez Jr.

503. Rosanna  Rodriguez

504. Marilyn  Rogers , individually and as guardian ad litem for Brea Zamora-Rogers, Sebastian  Zamora-Rogers,  Armani  Zamora-Rogers,  Christian  Zamora-Rogers, Ezra Zamora-Rogers, and Thea Zamora-Rogers

505. Robert  Rohn

506. Shannon  Rohn

507. Samantha  Rolon , individually and as guardian ad litem for Joshua Bradehorst Jr., and Melody Bradehorst

508. Neesa  Roman

509. Jose  Romero

510. Lilia  Romero

511. Daniel Shawn Roybal

512. Paul  Ryken

513. Wendy  Sacay

514. Ruben Robert Saiz

515. Veronica  Saiz

516. Joseph  Salazar

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

517. Nicolette Salazar, individually and as guardian ad litem for Alexander Salazar

518. Earvin Salecido

519. Brittany Sanchez, individually and as guardian ad litem for Gabriel Farias, and Izaiah Farias

520. Ilean Sanchez

521. Martin Sanchez

522. Anissa Santos, individually and as guardian ad litem for Jayden Santos, Kiyaa'anii Santos, and Tyson Santos

523. Christopher Santos

524. Jalynn Alissa Santos

525. Jayden Santos, a minor by and through her Guardian Ad Litem, Anissa Santos

526. Jeremy Andrew Santos

527. Joaquin A. Santos

528. John Anthony Santos

529. Karen Santos

530. Kiyaa'anii Santos, a minor by and through her Guardian Ad Litem, Anissa Santos

531. Shawna Lynne Santos

532. Tyson Santos, a minor by and through her Guardian Ad Litem, Anissa Santos

533. William Anthony Saraiva

534. John William Saum Jr.

535. Melanie Foote Saum

536. Brenda Karen Schoonover

537. Ronald Dean Schoonover

538. Thomas Carl Sellers

539. Dorothy Serafin, a minor by and through her Guardian Ad Litem, Shaunna Serafin

540. Paxon Gregory Serafin, a minor by and through her Guardian Ad Litem, Shaunna Jean Serafin

541. Shaunna Jean Serafin , individually and as Guardian ad litem for Dorthy Serafin and Paxon Gregory Serafin

542. Jamie Ramoni Shannon

543. Thomas Eugene Shannon

544. Natalie  Shoemaker , individually and as guardian ad litem for Lennox Ramos, Cole Ramos, Riley Martin, and Ryann Martin

545. Andrew  Silva

546. Riccko Erminio Marsiano Silva Jr.

547. Kabreka Sheniece Simmons , individually and as guardian ad litem for Morina Juliet Sloan

548. Mikayla Colleen Marie Simpkins

549. Brittany Elizabeth Simpson

550. Geraldine (Geri) Elizabeth Simpson

551. Richard Glen Simpson

552. Morina Juliet Sloan , a minor by and through her Guardian Ad Litem, Kabreka Sheniece Simmons

553. Christie Marie Smith

554. Curtis Joel Smith

555. Stephanie  Smith

556. Kamylah Vianey Solis , a minor by and through her Guardian Ad Litem, Maria Teresa Solis

557. Katia A. Solis , a minor by and through her Guardian Ad Litem, Maria Teresa Solis

558. Maria Teresa Solis , individually and as guardian ad litem for Kamylah Vianey Solis and Katia A. Solis

559. David Alonso Solis Sr.

560. David Alonso Solis-Lopez Jr.

561. Lisa R. Sollars

562. Joshua  Song

563. Xander  Spargur , a minor by and through her Guardian Ad Litem, Tiffany Hilarides

564. Roger  Stage

565. Christian  Stapley

566. Karen  Stapley

567. Constance "Connie" Elizabeth Stender

568. David  Stender

569. Linda  Stender

570. Brandon  Stephenson

571. Christopher Antwain Steward

572. Teresa  Steward

573. Charles  Stines

574. Beverly  Stoops

575. Mardell  Stovall

576. Terrence Preston Stovall

577. William  Stovall

578. Alison  Sturnacle , a minor by and through her Guardian Ad Litem, Monica Madrid

579. Cameron  Sturnacle

580. Mila Fay Sturnacle , a minor by and through her Guardian Ad Litem, Monica Madrid

581. Steven Jack  Sturnacle , a minor by and through her Guardian Ad Litem, Monica Madrid

582. Thomas Lorin Sturncale

583. Ashley  Suarez , individually and as guardian ad litem for Irene Luna, Melanie Luna, and Aaron Luna

/ / /

584. Britney Swenson , individually and as guardian ad litem for Micah Crigler, and Orion Crigler

585. Savanna Tafoya

586. Marsha Tate

587. Alexandria Thomas , individually and as guardian ad litem for Brooklynn Thomas

588. Brooklynn Thomas , a minor by and through her Guardian Ad Litem, Alexandria Thomas

589. Justin Trexler

590. Ezekiel Tripp

591. Jerry Tripp

592. Felicia Trujillo

593. Macario Trujillo IV

594. Evelyn Faye Turner

595. Moises Martinez Ulloa

596. Ruby Ann B. Umali , individually and as guardian ad litem for Amaya DeJager

597. Candace Marie Urban-Mcling

598. Anthony Vallejos

599. Gloria J. Vallejos

600. Mariah T. Valverde

601. James Vargas

602. David Vincent Velasquez

603. Evette Marie Velasquez

604. Gredan Vincent Velasquez

605. Jenny Ellen Velasquez

606. Leah Rae Velasquez

607. Lydia Deanna Velasquez

608. Mia Rose Velasquez

609.   Bernadette Ann Velasquez

610.   David E. Vickers

611.   Brandy  Victory

612.   Sandra  Viramontes

613.   Bryan Eugene Waggener

614.   Gregory Jay Walker

615.   Aiden  Walker-Banks

616.   Reanna Maria Walker-Banks

617.   Angela Lynn Weddle

618.   Steven  White

619.   Onyx  Wight

620.   Andrea  Williams

621.   Andrea  Williams

622.   Daniel  Williams

623.   Daniel Shane Williams

624.   John  Williams

625.   Naydean  Williams

626.   Terry Lynn Williams

627.   Lillie  Williamson

628.   William  Wood

629.   Barbara  Woodruff

630.   Michael  Woodruff

631.   Richelle  Woodruff

632.   Russell  Woodruff

633.   Garrett  Woods

634.   Mica  Woods , individually and as guardian ad litem for Savannah Woods

635.   Antonette  Woolridge

/ / /

636. Clifford  Woolridge III, individually and as guardian ad litem for Kandice Woolridge

637. Clifford  Woolridge Jr.

638. Kandice  Woolridge , a minor by and through her Guardian Ad Litem, Clifford Woolridge III

639. Teresita (Teresa)  Woolridge

640. Karl  Yanaga

641. Marc  Yslas

642. Lorena  Zamora

643. Karen Marlene Zelasney